

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-30-1999

# Childrens Seashore v Waldman

Precedential or Non-Precedential:

Docket 99-5024

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Childrens Seashore v Waldman" (1999). *1999 Decisions.* Paper 312.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/312

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5024

CHILDREN'S SEASHORE HOUSE,
        Appellant

v.

WILLIAM WALDMAN, COMMISSIONER OF THE NEW
JERSEY DEPARTMENT OF HUMAN SERVICES; KAREN
SQUARRELL, ACTING DIRECTOR, OF THE NEW JERSEY
DEPARTMENT OF HUMAN SERVICES, DIVISION OF
MEDICAL ASSISTANCE

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 98-02377)
District Judge: Honorable Anne E. Thompson

Argued September 17, 1999

BEFORE: GREENBERG, SCIRICA, and RENDELL,
Circuit Judges

(Filed: November 30, 1999)

        Mark H. Gallant (argued)
        Kimberly A. Bane
        Cozen and O'Connor
        The Atrium
        1900 Market Street
        Philadelphia, PA 19103

         Attorneys for Appellant

        John J. Farmer, Jr.
        Attorney General of New Jersey
        Nancy Kaplen
        Assistant Attorney General
        Rhonda S. Berliner-Gold (argued)
        Mary A. Hurley
        Deputy Attorneys General
        R.J. Hughes Justice Complex
        P.O. Box 112
        Trenton, N.J. 08625

         Attorneys for Appellees

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. STATEMENT OF THE CASE

Appellant, Children's Seashore House ("CSH"), a Philadelphia hospital that until 1990 had been located in Atlantic City, New Jersey, provides acute medical rehabilitation care to seriously injured or ill pediatric patients. CSH brought this action in the district court on May 8, 1998, seeking declaratory and injunctive relief to compel the New Jersey Department of Human Services to make disproportionate share hospital ("DSH") adjustments on account of CSH's treatment of Medicaid enrollees from New Jersey. In particular, CSH sued the commissioner of the Department and the director of its Division of Medical Assistance ("New Jersey") under 42 U.S.C.S 1983 in their official capacities to challenge New Jersey's amendment to

2

its Medicaid Plan effective September 20, 1996, which provides for the denial of DSH payments to hospitals located outside of New Jersey. CSH alleged that this policy violated CSH's rights under Title XIX of the Social Security Act, 42 U.S.C. SS 1396 et seq. ("Medicaid Act"), and the Equal Protection Clause of the Fourteenth Amendment. New Jersey asserts that it had made the DSH payments to out-of-state hospitals until July 1, 1993, but that thereafter while it was contemplating the amendment's adoption, it discontinued the payments. CSH contends, however, that New Jersey never made DSH payments to it after it moved to Philadelphia.

On September 25, 1998, New Jersey filed a motion to dismiss or in the alternative for summary judgment. On November 9, 1998, CSH filed a motion, which the district court referred to a magistrate judge, to amend its complaint to assert a claim under the Commerce Clause. The district court then decided the case in an opinion dated December 7, 1998, in which it indicated that in its discretion it was determining the "matter as a motion to dismiss" which it granted. Of course, the district court therefore did not make a ruling on the motion for summary judgment, and neither the magistrate judge nor the district court ever ruled on CSH's motion to amend. CSH then appealed.

II. STATUTORY FRAMEWORK

In order that this matter be understood, we set forth the statutory background of the case. Medicaid is a joint federal-state program that provides for the payment of medical services pursuant to the Medicaid Act to the poor, elderly, and disabled. See Rite Aid of Pa., Inc. v. Houstoun, 171 F.3d 842, 845 (3d Cir. 1999). To participate, a state must submit a State Plan to the Secretary of Health and Human Services and obtain its approval of the plan detailing how the state will disburse Medicaid money. Id. at 846. A state may change its plan by obtaining approval of a State Plan Amendment. Id. The United States makes contributions to a state's program provided its plan is consistent with the applicable Medicaid Act provisions.

Beginning in 1981, Congress provided additional payments for disproportionate share hospitals, meaning

hospitals serving a high percentage of indigent patients. The two provisions regarding DSH adjustments relevant to this case are 42 U.S.C. S 1396a(a)(13)(A) ("a-13") and 42 U.S.C. S 1396r-4 ("r-4"). A-13 provides for a public process through which a state determines and sets reimbursement rates, while r-4 outlines the specifications regarding DSH adjustments. As it now reads a-13 states in its entirety:

A State plan for medical assistance must --

(13) provide --

(A) for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which --

(i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,

(ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,

(iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and

(iv) in the case of hospitals, such rates take into account (in a manner consistent with [r-4]) the situation of hospitals which serve a disproportionate number of low-income patients with special needs . . . .

42 U.S.C. S 1396a(a)(13)(A) (emphasis added).

When Congress adopted the current version of a-13 in the Balanced Budget Act of 1997 it repealed the following language, commonly known as the Boren Amendment, that stated:

A State plan for medical assistance must --

(13) provide --

4

(A) for payment (except where the State agency is subject to an order under section 1396m of this title) of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates . . . which, in the case of hospitals . . . which serve a disproportionate number of low income patients with special needs . . . which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards. . . .

42 U.S.C. S 1396a(a)(13)(A) (West 1992) (repealed) (emphasis added).

Both the Boren Amendment and the 1997 amendment to a-13 are cross referenced with r-4. Thus, while r-4 continues to set the parameters for a state's provision of DSH adjustments, Congress in amending a-13 replaced the Boren Amendment's language requiring a state to pay "reasonable and adequate" rates with language mandating that a state provide a "public process" by which rates are determined in accordance with r-4. See Children's Hosp. and Health Ctr. v. Belshe, 188 F.3d 1090, 1094 (9th Cir. 1999).

A State Plan must provide for payment for covered services supplied by out-of-state hospitals to the state's own Medicaid program enrollees. See 42 U.S.C. S 1396a(a)(16); 42 C.F.R. S 431.52(b); West Virginia Univ. Hosps. Inc. v. Casey, 885 F.2d 11, 29 (3d Cir. 1989), aff'd on other grounds, 499 U.S. 83, 111 S.Ct. 1138 (1991). Moreover, it is clear that if Congress had not repealed the Boren Amendment in 1997, we would be bound to follow the holdings in West Virginia v. Casey that a state cannot set disproportionately low rates for out-of-state hospital services rendered -- including DSH adjustments-- for its Medicaid enrollees merely because the hospital is an out-of-state provider and that the out-of-state hospitals can enforce their rights to appropriate treatment. Id. at 17-22,

5

28-29; see also Wilder v. Virginia Hosp. Ass'n , 496 U.S. 498, 110 S.Ct. 2510 (1990). But inasmuch as we based West Virginia v. Casey on our conclusion that 771<!>Pennsylvania's denial of adjustments to out-of-state

hospitals violated the "reasonable and adequate" requirement of a-13 as it then existed, see 885 F.2d at 29, we now must determine whether Congress's removal of the "reasonable and adequate" language from a-13 requires a different result than that we reached in West Virginia v. Casey. Inasmuch as we conclude that the repeal of the Boren Amendment does require a result different from that in West Virginia v. Casey so that CSH cannot prevail on its direct statutory claim, we must decide whether its equal protection claim should have survived New Jersey's motion to dismiss.

## III. THE DISTRICT COURT OPINION

As we stated above, the district court dismissed CSH's complaint on New Jersey's motion to dismiss pursuant to Rule 12(b)(6).1 The court held that CSH lacks standing to bring its statutory claim because Congress intended to foreclose private enforcement of DSH adjustment payments when it repealed the Boren Amendment in 1997, and because r-4 itself did not confer standing on CSH. Applying the test the Supreme Court set forth in Blessing v. Freestone, 520 U.S. 329, 117 S.Ct. 1353 (1997), the court recognized that hospitals like CSH are the intended beneficiaries of r-4. The court reasoned, however, that while r-4 mandates that a state's Medicaid plan provide for an appropriate increase in Medicaid payments to DSHs based on specific rate adjustment procedures, unlike the Boren Amendment r-4 "does not mandate actual payment." Accordingly, the court held that r-4 "does not impose a binding obligation on New Jersey to actually afford CSH

_____

1. New Jersey indicated that it was moving to dismiss pursuant to Fed. R. Civ. P. 12(c). Rule 12(c), however, deals with motions for judgment on the pleadings. As a practical matter, however, in the context of this case there is no real distinction between the two types of motions. See Churchill v. Star Enter., 183 F.3d 184, 190 n.5 (3d Cir. 1999). Thus, inasmuch as the district court treated the motion under Rule 12(b)(6) standards, we will as well.

payment, such that CSH has a federal right to payment under S 1983." Moreover, the court found that Congress's repeal of the Boren Amendment supported this conclusion as Congress eliminated the statutory provision mandating "reasonable and adequate" payment that had been regarded as conferring standing upon plaintiffs in the past. The court found its conclusions buttressed by statements of congressional intent to eliminate causes of action for hospitals and nursing facilities challenging the adequacy of the rates they receive.[2]

When the court addressed CSH's equal protection claim, it held that CSH could not maintain a valid claim because (1) the Medicaid Act does not "specifically" require states to fund out-of-state DSHs; (2) New Jersey was not treating CSH differently than it treated any other out-of-state hospital; and (3) the federal government had approved New Jersey's current Medicaid plan, including its policy not to provide for DSH adjustments to out-of-state hospitals, as conforming with Medicaid's requirements. Nevertheless, the court believed that its ruling was in tension with our rejection of what it called "Pennsylvania's alleged rational basis for excluding out of state hospitals from its Medicaid program" in West Virginia v. Casey, 885 F.2d at 29. But the court distinguished that case by pointing out that while "the West Virginia hospital which brought suit served an extremely high number of Pennsylvania residents," "[CSH's] complaint makes no such [equivalent] allegation. . . ." Accordingly, the court dismissed CSH's equal protection claim in addition to its statutory claim to enforce the Medicaid Act.

IV. DISCUSSION

CSH argues that the district court failed to recognize that r-4 authorizes actions to enforce DSH adjustments because r-4 delineates rights established by Congress for the specific benefit of DSHs and obligates the states to make supplemental payments to these hospitals. CSH contends

_____

2. The court also held that Medicaid's public notice provisions do not confer standing because they "are less than specific, mandatory requirements." CSH does not challenge this conclusion on this appeal.

7

that, in repealing the Boren Amendment, Congress did not repeal the requirement in r-4 mandating payment of adjustments to DSHs, but actually fortified the states' obligations to these providers. According to CSH, the court's assessment of the legislative history was erroneous, as the court relied upon statements concerning versions of the 1997 amendment to the Medicaid Act that Congress later changed and in any case did not address enforcement of the DSH provisions.

Additionally, CSH asserts that it has alleged a viable 42 U.S.C. S 1983 claim under the Equal Protection and Commerce Clauses. CSH contends that if viewed under either heightened or rational-basis scrutiny, the denial of benefits to hospitals based upon their domiciles violates both clauses. Finally, CSH contends that the district court's reliance on federal approval of New Jersey's plan cannot support its result.

We will affirm the district court's order dismissing CSH's statutory claim seeking to enforce the Medicaid Act with respect to DSH payments in light of the passage of the Balanced Budget Act of 1997 amending a-13. We, however, will reverse the order of dismissal to the extent that it dismissed the equal protection claim and will remand the case to the district court for further consideration of that claim as well as CSH's motion for leave to amend its complaint to assert a Commerce Clause claim.

A. Standard of Review

We exercise plenary review over the district court's order granting the motion to dismiss. See McClintock v. Eichelberger, 169 F.3d 812, 816 (3d Cir.), cert. denied, 120 S.Ct. 182 (1999). Furthermore, we must consider all factual allegations pled in the complaint as true and can affirm the district court's order of dismissal only if we are certain that CSH cannot prove any set of facts in support of its claim that would entitle it to relief. Moreover, regarding CSH's equal protection claim, "[s]ince this is aS 1983 action, [CSH is] entitled to relief if [its] complaint sufficiently alleges deprivation of any right secured by the Constitution. In considering a Rule 12(b)(6) motion, we do not inquire

8

whether [CSH] will ultimately prevail, only whether [it is] entitled to offer evidence to support [its] claims." Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) (citations omitted).

B. CHS's Statutory Claim to Enforce the Disproportionate Share Adjustments

CSH argues that even if Congress's passage of the Balanced Budget Act of 1997 eliminated its ability under a-13 to enforce the DSH adjustments, nevertheless a court can enforce the adjustments under r-4. As noted above, the district court rejected this argument because it reasoned that r-4 does not impose a binding obligation on states to pay the adjustments. A-13 now mandates that a state provide for "a public process" for determination of rates. The process requires publication of the proposed rates together with the methodologies and justifications used to establish to those rates. Providers, beneficiaries, and other concerned state residents must be given a reasonable opportunity for review of and comment on the proposed rates, methodologies and justifications. Then thefinal rates, as well as methodologies and justifications for the rates, must be published. Finally, the rates must take into account the situation of DSHs in a manner consistent with r-4. See 42 U.S.C. S 1396a(a)(13)(A).

In Blessing v. Freestone, 520 U.S. at 340-41, 117 S.Ct. at 1359 (citations omitted), the Supreme Court said that a federal statute gives rise to a privately enforceable right if a court finds all three of the following circumstances present:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so `vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States.

We think it is clear that by amending a-13 in 1997, Congress eliminated the Boren Amendment's requirement that a state must provide for and assure the Secretary of Health and Human Services that its rates are "reasonable and adequate." As we recognized in Rite Aid v. Houstoun,

9

the Boren Amendment set procedural and substantive requirements: "The Boren Amendment instructed state agencies to make findings and assurances that their Medicaid reimbursement rates promote economy, efficiency, quality of care, and equal access. . . ." 171 F.3d at 852. Yet, by replacing the Boren Amendment with a requirement that a state establish a public process by which its rates would be determined, Congress has removed a party's ability to enforce any substantive right. See HCMF Corp. v. Gilmore, 26 F. Supp.2d 873, 880 (W.D. Va. 1998) ("With the repeal of the Boren Amendment nothing remains that remotely resembles a federal right to reasonable and adequate rates. There is no federal statutory language to parse. There is only a state standard. It follows that there can be no prospective relief under S 1396a(a)(13). . . .").

The legislative history confirms this reading of the statute. H.R. Conf. Rep. No. 105-217 (1997), reprinted in 1997 U.S.C.C.A.N. 176, 488, begins its discussion of the proposed change to a-13 with this description of the law under the Boren Amendment:

> Under so-called Boren amendments, states are required to pay hospitals, nursing facilities, and intermediate care facilities for the mentally retarded (ICFs/MR) rates that are `reasonable and adequate' to cover the costs which must be incurred by `efficiently and economically operated facilities.' A number of courts found that state systems failed to meet the test of `reasonableness' and some states have had to increase payments to these providers.

The conference agreement, which became the new a-13, according to the report "[r]epeals the Boren amendments and establishes a public process under which proposed rates, methodologies underlying the rates and the justifications for such rates are published and subject to public review and comment, and final rates are published with underlying methodologies and justifications." Id. at 489.

Thus, unless r-4 establishes an enforceable right on its own, CSH does not have an enforceable statutory claim. Yet, r-4 imposes neither procedural nor substantive

10

requirements on a state that provide a basis for CSH to press its claims. Rather, r-4 is a definitional provision that describes certain procedures that a state must satisfy, such as submitting a qualifying plan to the Secretary of Health and Human Services by a certain date to establish an adequate state disproportionate share hospital adjustment plan. 42 U.S.C. S 1396r-4(a). Moreover, r-4 sets the parameters of what is a DSH, what constitutes an adequate payment adjustment, and what limits are placed on federal financial participation and on state allotments for each year. We are satisfied that CSH cannot predicate its claim on these provisions. For this reason, we will affirm the district court's dismissal of CSH's section 1983 statutory claim and its finding that CSH cannot successfully maintain an action to enforce the Medicaid Act with respect to DSH adjustments.3

C. Equal Protection

CSH claims that New Jersey's policy discriminates on its face against out-of-state hospitals in favor of domestic enterprises.4 The Supreme Court has held that according to equal protection jurisprudence, "whatever the extent of a State's authority to exclude foreign corporations from doing business within its boundaries, that authority does not

_____

3. CSH cites Orthopaedic Hospital v. Belshe , 103 F.3d 1491 (9th Cir. 1997), cert. denied, 118 S.Ct. 684 (1998), Rite Aid v. Houstoun, 171 F.3d 842, and Doe v. Chiles, 136 F.3d 709 (11th Cir. 1998), for the proposition that "[t]he Boren Amendment is only one of several provisions of the Medicaid Act on which providers have based S 1983 claims." Brief at 14. While this is true, none of these cases was predicated upon the current version of a-13 or upon r-4. Moreover, these cases are all distinguishable from the current situation because each of them rested upon different provisions of the Medicaid Act that "unlike r-4" have a substantive or procedural requirement.

4. CSH argues that this denial rises to the level of burdening a fundamental right and is therefore subject to strict scrutiny. However, inasmuch as CSH concentrates its argument upon a rational basis model of equal protection, we will as well. In any event, we have no need at this time to determine whether this is a strict scrutiny case because CSH's complaint survives a motion to dismiss in which only a rational basis justification is implicated.

11

justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose." Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 875, 105 S.Ct. 1676, 1680 (1985) (internal quotation marks omitted).[5]

As we noted above, the district court rested its rejection of CSH's equal protection claim upon its belief that federal law does not require New Jersey to pay out-of-state hospitals because of federal approval of New Jersey's Medicaid plan including New Jersey's express statement that it would not provide for adjustments to out-of-state providers, and because the "current Medicaid statute does not specifically require States to fund DSH facilities outside their own borders." The court distinguished West Virginia v. Casey on the ground that "the West Virginia hospital which brought suit served an extremely high number of Pennsylvania residents." Moreover, the court thought that it was significant that New Jersey was not treating CSH differently than other hospitals outside of that state.

New Jersey in a supplemental letter brief urges that we affirm the district court's order dismissing the equal protection claim for the following reasons:

> First, New Jersey does not have sufficient information and data with which to determine whether an out-of-state hospital is entitled to DSH payments under the varying rules for making the determination. Indeed, as set forth in the State's main brief, any state can treat any hospital as a DSH hospital. Second, it would be an onerous task for New Jersey to monitor whether an out-of-state hospital has already been fully compensated by either its home state or other states [6] in

---

5. Likewise, the courts consider discriminatory treatment based upon a citizen's state of residence a potential violation of the Privileges and Immunities Clause. See Lunding v. New York Tax Appeals Tribunal, 118 S.Ct. 766, 774 (1998) ("Where nonresidents are subject to different treatment, there must be reasonable ground for . . . diversity of treatment.") (internal quotation marks omitted).

6. This assumes that if all states were required to make DSH payments to out-of-state hospitals, other states may also be obligated to make DSH

12

accordance with 42 U.S.C. S 1396r-4(g), which limits the amount of DSH payments an individual hospital is entitled to receive.

Third, as now codified at 42 U.S.C. S 1396r-4(f), states' DSH allotments were changed so that set amounts are provided for each year beginning with Fiscal Year 1998. Clearly Congress reached a decision about how much each individual state was entitled to receive and there is no evidence that it considered, in its calculation, that a state may be required to give away significant portions of its DSH allotment to other states, particularly given the significant lobbying by the states which occurred prior to the final figures being enacted into law.

Fourth, this calculation is further complicated because it is not possible for New Jersey to anticipate where its residents may ultimately receive care. The statute either applies to out-of-state hospitals or it does not; there is no basis to limit DSH payments only to `border' hospitals.

Fifth, once a hospital qualifies for a DSH payment, the hospital can use that money for any purpose, even non-medical purposes, because DSH payments are not payments for services provided. Nor would the hospital be required to even use the money received from New Jersey on New Jersey patients.

Lastly, out-of-state hospitals already receive DSH payments from the home state covering care provided to out-of-state residents. The home state is required to take into account treatment of out-of-state indigent patients when determining whether a hospital qualifies for DSH payments and how much DSH that hospital is entitled to receive.

Section 1923(b)(2) of the Act bases the Medicaid utilization rate on a formula that includes patient

---

payments to a particular hospital. For example, a hospital could claim a DSH payment from any state as long as it treated at least one resident from that state. [This footnote is quoted from the letter brief.]

13

days furnished to patients eligible for Medicaid
. . . [t]he State must consider the total number of
patient days attributable to Medicaid recipients
regardless of which state would be responsible for
payment for the service. This is to ensure that each
hospital that meets the . . . [DSH] requirement[s] is
accorded disproportionate share status regardless of
the origin of those patients. Id. [55 Fed. Reg. at
10079 (emphasis added)].

It is unreasonable to conclude that Congress intended
to have both other states and the home state count the
same patient days, and reimburse for the same patient
days. These six reasons for New Jersey's denial of out-
of-state DSH payments more than satisfies the rational
relationship test.

In our view, the district court's rationales cannot support
a dismissal of the action. The absence of a provision in the
Medicaid Act requiring that states fund DSH facilities
outside their borders does not mean that a state
constitutionally can differentiate between in-state and out-
of-state facilities. Rather, it means simply that there is no
statutory requirement for equal treatment. Furthermore,
federal approval of the amendment to the plan at most
could foreclose a statutory argument challenging the denial
of DSH payments. Moreover, the fact that New Jersey treats
all out-of-state facilities equally by denying them DSH
payments does not address the issue CSH raises as it is
complaining about its treatment as compared to treatment
of New Jersey facilities, not as compared to treatment of
other out-of-state facilities. In the circumstances, we
cannot uphold the district court's reasoning on why CSH
has failed to allege a claim on which relief can be granted
on the equal protection claim.

Additionally, we cannot uphold the Rule 12(b)(6)
dismissal on the basis of New Jersey's arguments that we
quote above, as its contentions introduce matters into the
case that go far beyond the complaint and even the
pleadings as a whole and introduce factual questions which
we cannot address at this time.7 In short, we are not
_____

7. We realize that a court on a motion to dismiss can consider matters
of public record, see Churchill v. Star Enter., 183 F.3d 184, 190 n.5 (3d
Cir. 1999), but New Jersey's contentions go beyond that record.

14

satisfied from the complaint or even all the pleadings that CSH will not be able to prove any set of facts that will entitle it to relief.

Accordingly, while we express no view on whether CSH ultimately will prevail on the equal protection claim, we think that the claim should have survived New Jersey's motion to dismiss. See also West Virginia v. Casey, 885 F.2d at 29 ("Pennsylvania's excuse of administrative burden does not, in this case, provide a rational basis for[the hospital's] grossly diminished reimbursement rates."). Therefore, we will remand the case to the district court for further proceedings on that claim. On the remand CSH may renew its motion to amend to assert its Commerce Clause claim.

V. CONCLUSION

For the foregoing reasons we will affirm the order of December 7, 1998, to the extent that it dismissed CSH's statutory claims but will reverse it to the extent that it dismissed the equal protection claim. We will remand the matter to the district court for further proceedings consistent with this decision. The parties will bear their own costs on this appeal.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit