**In re NYAHSA LITIGATION.**

Nos. 95–CV–1504, 96–CV–0379, 96–CV–1934, 99–CV–2143, 00–CV–1172, 03–CV–1132.

United States District Court, N.D. New York.

May 20, 2004.

Cadwalader, Wickersham & Taft LLP, (Peter Bergmann, Esq., Kathy H. Chin, Esq., of Counsel), New York City, for Plaintiffs.

Eliot Spitzer, Office of the Attorney General (Lisa Ullman, Esq., Assistant Attorney General, of Counsel), Albany, NY, for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I.  INTRODUCTION

Plaintiffs New York Association of Homes and Services for the Aging, Inc., a non-profit corporation, on behalf of its membership, which includes approximately 300 residential health care facilities, and certain individual nursing facilities ("plaintiffs" or "providers"), brought this action against New York State and various of its agencies and employees ("defendants"), alleging that a number of cost-control measures enacted as part of the State's annual budget violate providers' rights under certain statutory sections of and regulations promulgated under the Medicaid Act, 42

U.S.C. §§ 1396 *et seq.*,[1] and the substantive due process, procedural due process, and equal protection clauses of the Constitution.[2]

Plaintiffs and defendants have both moved for summary judgment pursuant to Fed.R.Civ.P. 56. Oral argument was heard on July 25, 2003, in Albany, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

### A. Relevant Medicaid Act Sections

Before outlining the challenged measures enacted by the State through budget legislation, it is helpful to briefly describe the relevant statutory and regulatory sections of the Medicaid Act, under which most of plaintiffs' federal claims are asserted pursuant to 42 U.S.C. § 1983.

Medicaid is a federal program that provides funding to States choosing to reimburse health care facilities for services provided to and medical costs incurred by those in need. The rate at which facilities are reimbursed is set by the State, subject to various Medicaid Act provisions and regulations, with which the State is required to comply if it opts to participate in the program and desires federal funding.

In 1980, Congress amended the Medicaid Act by passage of what is commonly referred to as the Boren Amendment, former 42 U.S.C. § 1396a(a)(13)(A). Under the amendment, providers had a substantive right to reasonable and adequate reimbursement rates, and a procedural right to have such rates accompanied by findings and assurances, made by the State, as to their reasonableness and adequacy. In 1987, added to the Boren Amendment

was the requirement that States, in setting reimbursement rates, take into account providers' compliance with several quality-related requirements that were then imposed. 42 U.S.C. § 1396r(b).

The Boren Amendment was repealed effective October 1, 1997, by Congress through the Balanced Budget Act of 1997, Pub.L. 105–33, § 4711(a)(1), 111 Stat. 251, 507–08 (1997). In its stead stands the requirement that a State plan must provide for a public process with respect to its determination of reimbursement rates, including most notably a notice and comment procedure, current 42 U.S.C. § 1396a(a)(13)(A). Pursuant to federal regulation, the public notice of proposed changes in the methodology to determine reimbursement rates is to give an estimate of any expected increase or decrease in aggregate expenditures. Federal regulations also require that States must provide an appeals procedure by which providers can submit additional evidence and receive prompt administrative review of reimbursement rates.

Also relevant in setting reimbursement rates is 42 U.S.C. § 1396a(a)(30)(A), which has been in existence since 1981 and was not affected by repeal of the Boren Amendment. The section mandates that States provide methods and procedures as may be necessary to safeguard against unnecessary utilization of care and services, and to assure that any reimbursement rates it pays to providers are consistent with what is needed by facilities to maintain efficient, economic, and quality care. In 1989, Congress added the requirement that payments under a State

---

**1.** The Medicaid Act statutory sections cited by plaintiffs are former § 1396a(a)(13)(A), current § 1396a(a)(13)(A), § 1396a(a)(30)(A), and § 1396r(b). Among the federal regulations promulgated under the Medicaid Act that are most prominently cited by plaintiffs

are 42 C.F.R. §§ 447.253(e), 447.204, 447.256(c), 447.205(c)(2), 447.253(h).

**2.** Plaintiffs also assert state law claims, though for purposes of this opinion they need not be discussed.

plan were to be sufficient to enlist enough providers so that care is available under the plan at least to the extent that it was available to the general population in the relevant geographic area. 42 U.S.C. § 1396r.

## B. Challenged Measures

In this case, plaintiffs—a non-profit organization representing its Medicaid provider members and certain individual Medicaid providers—challenge certain cost-control measures enacted by the State over the years as part of annual budget legislation that allegedly impact the methodology by which the Medicaid reimbursement rates of providers are set. While for the purposes of this opinion the parameters of the State's reimbursement methodology and the challenged measures need not be extensively detailed, some mention is appropriate to place the case into better context.

### 1. Reimbursement Methodology

Since 1986, the New York State Department of Health has used the "RUG–II Methodology" to calculate Medicaid reimbursement rates to be used in paying Medicaid providers. Under RUG–II, each facility receives a facility-specific, per patient, per day reimbursement rate made up of four components. Rates are calculated using costs incurred in a prior year, called the "base year." The base year used at least throughout the 1980's and 1990's was 1983. Base year costs are trended forward to a particular rate year by the addition of percentage increases in an effort to account for inflation.

The direct component of the rate reimburses costs directly related to patient care, including nursing, various therapies, transportation services, social services, and patient activities. It is computed by multiplying the allowable base year direct costs per patient per day by the facility's "case mix index." The case mix index is the measure of the resources needed to care for patients relative to other facilities. The resources needed are compared to statewide base and ceiling prices established for that case mix index. If the direct costs exceed the ceiling, the facility is reimbursed in the ceiling amount; if a facility's costs are below the base for the case mix index, they receive the base amount; and if the costs are between the base and the ceiling, the facility receives whatever its costs are.

The indirect component of the rate reimburses costs not directly related to patient care, such as fiscal and administrative services, housekeeping, food services, and medical education. The reimbursement of indirect costs is also subject to ceiling limits. Facilities are combined into peer groups based on size, affiliation, and case mix index. Allowable costs are then compared to peer group ceilings to arrive at the indirect cost reimbursement.

The other two components of the methodology reimburse facilities based on non-comparable costs (facility-specific costs, such as supervision of volunteers, lab services, etc.) and capital costs (such as building costs, fixed and movable equipment costs, costs of capital improvements, etc.).

### 2. Primary Challenged Measures

As noted, plaintiffs challenge several measures enacted in annual budget legislation that they claim improperly impact the RUG–II methodology used for setting reimbursement rates to be used in paying Medicaid providers.

#### a. the A/F cap

Beginning in 1995, the State's budget bill has included a measure that places a cap on administrative and fiscal costs ("A/F costs"), which are factored into the indirect component of the State's reimbursement methodology. Plaintiffs claim

that, despite already being subject to peer group limits and salary ceilings for administrators, this measure further limited reimbursable A/F costs by disallowing costs that exceeded the statewide average of total reimbursable base year A/F costs. Reimbursable base year A/F costs are those costs remaining after application of all other efficiency standards, including peer group limits.

### b. the trend factor "freeze"

Also beginning in 1995, the State's budget bill has contained what plaintiffs term a "trend factor freeze." Since New York began using its reimbursement methodology, a trend factor has been utilized in calculating reimbursement rates in order to account for increasing nursing home costs brought on by inflation. According to plaintiffs, defendants have "frozen" the trend factor as it existed on a certain date. Section 23 of the Health Care Reform Act of 2000 ("HCRA") extended the 1996 Budget Bill's trend factor freeze through March 31, 2003, and changed the manner in which the trend factor itself was calculated, according to plaintiffs. Previously, they claim, the trend factor was established by a panel of health care economic experts using, among other things, proxies for labor and non-labor items. Some time after issuing a report in 1995, however, the Department of Health ceased convening the panel, which plaintiffs claim had suggested future modifications to the procedure used to establish the trend factor. Under the HCRA, effective April 1, 2000, the trend factor was to be tied to the Federal Consumer Price Index, rather than specific health care variables.

### c. appeal moratorium/monetary cap

Also beginning in 1995, the budget bill has included a one-year moratorium on the processing and determination of reimbursement rate appeals. In 1996, Section 2808(15) of the Public Health Law was amended by placing a $47 million monetary cap on reimbursement rates revised through the appeals process during the period of April 1, 1996, to March 31, 1997. Subsequent budget bills essentially combined the moratorium and the monetary cap, imposing the former for a period and then imposing the latter thereafter.

### d. $56 million reduction for efficiency

In the 1996 Budget Bill, Section 2808(13) of the Public Health Law was amended to require a $56 million statewide reduction in reimbursement rates for the year 1995. The reduction was purportedly a reflection of the elimination of operational requirements previously imposed on nursing facilities by law and/or regulation. No requirements, however, were eliminated that year, so the reduction did not go into effect. The following year, though, amended Section 2808(16) was enacted, requiring a $56 million reduction, applicable from April 1, 1996, to March 31, 1997, on the basis of encouraging improved productivity and efficiency. Using data from two years prior to the rate year, the reduction was effectuated by multiplying $56 million by a facility's percentage of total Medicaid patient days compared to Medicaid patient days for nursing facilities statewide.

### e. suspension of bar on retroactive rate setting

Plaintiffs also declare improper a measure first enacted in the 1999 Budget Bill declaring that Section 2808(17) of the Public Health Law, which barred retroactive rate setting, to be without force and effect for a twelve-month period.

### f. elimination of cap on cash receipts assessment

Plaintiffs also challenge enacted measures relating to the cash receipts assessment imposed by the Department of

Health pursuant to Section 2807–d. The cash receipts assessment is a tax imposed on facilities' gross revenues, certain portions of which are Medicaid reimbursable. The taxes collected proved to be excessive, so a cap was placed on the amount of certain portions of the total statewide assessment. Any collections in excess of the cap were to be returned to the facilities on a pro rata basis. The challenged measures eliminated the cap and return and provided for the transfer of $37 million in assessments to a general state medical fund account.

### C. Plan Amendments

A State wishing to amend its Medicaid reimbursement rate methodology must submit a state plan amendment ("SPA") and have it approved by the federal government. Intertwined with the merits of several of plaintiffs' claims are defendants' proposed SPAs, sent to the United States Health Care Administration ("HCFA"), the agency responsible for approval. Though not particularly germane to this opinion, some of the history regarding defendants' submissions and the HCFA's responses is worthy of mention.

#### 1. 1995–1997 SPAs

On June 20, 1995, June 26, 1996, and June 30, 1997, defendants submitted SPAs to the United States Health Care Financing Administration ("HCFA"). According to plaintiffs, each of these proposed amendments contained material misrepresentations and did not adequately, or did not at all, disclose certain of the challenged measures. Each year, the HCFA responded to the relevant SPA with a letter outlining its concerns with defendants' Boren Amendment compliance. The HCFA reminded defendants that each new SPA could not be approved until the concerns regarding the prior one or ones had been addressed. Shortly after the HCFA's letter regarding the SPA submit-

ted in 1997, the effective date of the Boren Amendment's repeal arrived.

#### 2. Defendants' Response Addressing 1995 SPA

On November 28, 1997, defendants responded in writing to the HCFA's September 13, 1995, letter concerning the SPA submitted in 1995. Defendants submitted purported findings concerning the reasonableness and adequacy of the reimbursement rates, though plaintiffs claim without addressing the specific concerns raised by the HCFA. Defendants also withdrew an aspect of the amendment relating to the $56 million reduction.

#### 3. Letter From Plaintiffs' Counsel and HCFA Response

On April 20, 1998, an attorney for certain provider facilities wrote the HCFA concerning what he perceived to be material misrepresentations in defendants' SPAs. The HCFA responded by writing to defendants, advising them that counsel's letter raised concerns similar to its own, and requiring a response from them regarding the SPAs submitted in 1995 and 1996.

#### 4. 1999 SPA

In September of 1999, defendants submitted another SPA to the HCFA for approval. By letter sent to defendants in November of that same year, the HCFA expressed concern over the submission, including that its pages appeared to be parts of one or more of the SPAs submitted in 1995, 1996, and 1997. The letter reminded defendants that each of these prior SPAs was subject to an outstanding request for information, and that defendants needed to respond to such requests before processing could begin on the 1999 SPA. On March 31, 2000, defendants provided a response, which the HCFA found satisfacto-

ry, but noted that it was still unable to process the 1999 SPA until the concerns over the prior SPAs had been resolved.

### 5. *2000 SPA*

On March 22, 2000, defendants submitted another SPA for approval. By letter dated May 24, 2000, the HCFA expressed its concern that defendants were attempting to continue various provisions from prior SPAs that had yet to be approved. It requested defendants provide a draft response to the issues raised and even provided the State with a chart demonstrating the relationship and similarity among the current and prior SPAs.

### 6. *Remaining Correspondence and Approval of all SPAs*

In September of 2000, counsel for some of the facility providers again wrote the HCFA regarding the 1995 and 1996 SPAs, expressing concern over compliance with the Boren Amendment and its successor, and over alleged falsehoods told by defendants. The HCFA responded in writing to defendants, reminding them that prior concerns had not yet been resolved, and specifically requesting a response in regards to the 1995 and 1996 SPAs. After approximately four months had passed with no response from defendants, counsel again wrote the HCFA, which again wrote to defendants requesting a response.

On May 22, 2001, defendants submitted a response to the concerns raised over the 1995, 1996, and 1997 SPAs. Plaintiffs claim this response was woefully inadequate and did little to address the specific concerns repeatedly raised in the past. Nonetheless, a few weeks later, the HCFA advised defendants that its SPAs for 1995, 1996, 1997, 1999, and 2000 had been approved.

## III. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. N.Y. State Dep't of Corr. Service*, 180 F.3d 426, 436 (2d Cir. 1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. At that point, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348. Indeed, to withstand a summary judgment motion, the nonmoving party must demonstrate that sufficient evidence exists upon which a reasonable jury could return a verdict in its favor. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. *Medicaid Claims*

Plaintiffs primarily claim that the measures enacted as part of the State's annual budget violate several specific sections of and regulations attendant to the Medicaid Act. However, all of these claims are unen-

forceable against defendants by providers through 42 U.S.C. § 1983.

### 1. *Eleventh Amendment Immunity— Boren Amendment Claims*

■ The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. It is well established that neither the state nor its agencies can be sued under Section 1983, *see Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998), unless the plaintiff is seeking prospective and injunctive relief to prevent the continuation of an ongoing violation of federal law, *Gaby v. Bd. of Trustees of Cmty. Technical Colls.,* 348 F.3d 62, 63 (2d Cir.2003) (quoting *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)), an exemption to immunity recognized long ago by the Supreme Court, *see Ex Parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Court emphasized more recently, however, that in all but the most unusual case this exemption does not extend to retrospective relief, including nominal declarations that a now-repealed statutory section has been violated. *See Green v. Mansour,* 474 U.S. 64, 71–73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (also expressing worry that the awarding of such retrospective relief would be used for res judicata purposes on the issue of liability in a state court action, thereby providing an impermissible "partial end run" around the Court's decision in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).

Here, several of plaintiffs' claims appear to be based on the Boren Amendment, which though it guaranteed to providers substantive and procedural rights regarding reasonable and adequate reimbursement rates, *see Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 509–10, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (holding that these rights were afforded by the amendment and could be enforced by providers via 42 U.S.C. § 1983), was repealed in 1997 by the Balanced Budget Act of 1997, Pub.L. 105–33, § 4711(a), 111 Stat. 251, 507–08 (1997). Thus, plaintiffs could obtain no meaningful prospective relief because any violation of the amendment would not be ongoing. The remedy with which plaintiffs are left is a declaration that the Boren Amendment was violated in the past. This relief is foreclosed by the Supreme Court's opinion in *Green.* Therefore, Eleventh Amendment immunity attaches to plaintiffs' Boren Amendment claims.

Plaintiffs attempt to escape the reach of such immunity by claiming that, because defendants have failed to comply with the Boren Amendment's successor, the public process requirement, the reimbursement rates paid to facilities remain subject to the amendment. And, because it is alleged that defendants are not in compliance with the Boren Amendment, plaintiffs claim there is indeed an ongoing violation of federal law subject to redress through a § 1983 action against defendants. As primary support for this position, plaintiffs cite *Children's Hosp. & Health Ctr. v. Belshe,* 188 F.3d 1090 (9th Cir.1999). The panel in *Belshe* cited a December 10, 1997, letter from the HCFA, in which it claimed the HCFA "authorized [S]tates to continue to use payment methodologies approved under the Boren Amendment notwithstanding its repeal," and held that because the California Department of Health Services failed to comply with the public process requirement, its payment methodology remained subject to the Boren Amendment. *Id.* at 1095, 1099.

However, "regardless of whether the HCFA letter properly authorizes the application of Boren Amendment standards to the payments at issue here," a policy letter cannot *by itself* give rise· to a federal right enforceable under § 1983. *HCMF Corp. v. Allen,* 238 F.3d 273, 277 (4th Cir.2001) (noting that policy letter "has even less legal stature than a [federal] regulation," which also cannot by itself give rise to a federally enforceable right). Indeed, "[w]ith the repeal of the Boren Amendment nothing remains that remotely resembles a federal right to [its substantive and procedural guarantees].... It follows that there can be prospective relief under [former] § 1396a(a)(13)(A)..." *HCMF Corp. v. Gilmore,* 26 F.Supp.2d 873, 880 (W.D.Va.1998). Plaintiffs' claims under the Boren Amendment will, therefore, be dismissed.

### 2. *Enforceable Rights—Remaining Medicaid Claims*

Plaintiffs also challenge the measures enacted as part of the State's annual budget legislation under a number of other Medicaid Act sections, as well as certain federal regulations promulgated pursuant to the statute. None of the asserted sections and regulations, however, create a federal right for providers that it is enforceable via § 1983.

#### a. *statutory sections*

■ 42 U.S.C. § 1983 is the "basic vehicle" by which a federal court adjudges alleged state and local infringements of federally created rights. *Greene v. Hawes,* 913 F.Supp. 136, 141 (N.D.N.Y. 1996). Section 1983 itself creates no substantive rights, but provides a "procedure of redress for the deprivation of rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). Three factors are examined to determine if a statute creates a federal right enforceable through a § 1983 action: (1) "Congress

must have intended that the provision in question benefit the plaintiff"; (2) "[T]he plaintiff must demonstrate that the right asserted is not so vague and amorphous that its enforcement would strain judicial competence"; and (3) "[T]he statute must unambiguously impose a binding obligation on the States." *Blessing v. Freestone,* 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Concerned that some courts had interpreted *Blessing* "as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect," the Supreme Court subsequently made clear that nothing "short of an unambiguously conferred right to support a cause of action" must appear in the relevant statute. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). None of the statutory sections under which plaintiffs purport to assert claims create a federal right enforceable for providers through § 1983.

#### (i). current § 1396a(a)(13)(A)— public process requirement

■ Plaintiff asserts that the challenged measures were enacted in violation of current 42 U.S.C. § 1396a(a)(13), the successor to the Boren Amendment. That section provides that "[a] State plan for medical assistance must ... provide for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which ... providers, ... are given a reasonable opportunity for review and comment on the proposed rates ..." Through the repeal of the Boren Amendment and the enactment of this section, "according to the legislative history, Congress intended to free the states from federal regulation and to eliminate a basis for causes of action by pro-

viders to challenge reimbursement rates." *Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 919 n. 12 (5th Cir. 2000) (citing H.R.Rep. No. 105–149, at 1230) ("It is the Committee's intention that, following the enactment of [the Balanced Budget Act of 1997], neither this nor any other provision of [§ 1396a] will be interpreted as establishing a cause of action for hospitals and nursing facilities relative to the adequacy of the rates they receive").[3] Thus, "by replacing the Boren Amendment with a requirement that a state establish a public process by which its rates would be determined, Congress has removed a party's ability to enforce any substantive right." *See Children's Seashore House v. Waldman*, 197 F.3d 654, 659 (3d Cir.1999).[4]

(ii). § 1396a(a)(30)(A)—efficiency/economy/quality of care and equal access

■ Plaintiff asserts that the challenged measures violate 42 U.S.C. § 1396a(a)(30)(A), which provides that

A State plan for medical assistance must ... provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are

available to the general population in the geographic area.

*Id.*

Adopted is the position of the First, Third, and Fifth Circuits that this language was intended to benefit Medicaid recipients, not providers, and that providers therefore cannot use § 1983 to enforce any rights contained in § 1396a(a)(30)(A). *See Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 56–57 (1st Cir. 2004) ("Nothing in subsection 30(A) expressly provides that those who furnish Medicaid services have any enforcement rights or, indeed, have any specific rights to procedural (e.g., notice and comment) or substantive (e.g., just and reasonable rates) protections"); *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 537–38 (3d Cir.2002) (breaking down individual requirements in § 1396a(a)(30)(A)—"efficiency," "economy," "quality of care," and "adequate access"—and finding all are intended to benefit Medicaid recipients, not providers); *Hood*, 235 F.3d at 928–29.[5] According to the Third Circuit:

Unlike the Boren Amendment, [§ 1396a(a)(30)(A) ] evinces no direct concern for the economic situation of providers. Instead, it demands that payments be set at levels that are sufficient to meet recipients' needs. It is 'phrased in terms benefiting' recipients, and the adequacy of payments is measured in relation to the health needs of recipients. It manifests concern solely for the well-being of recipients. It is

---

**3.** Because the defendant, a Louisiana public official, did not raise the issue of whether § 1396a(a)(13)(A) permitted a provider to bring a claim, the Fifth Circuit in *Hood* went on to discuss defendant's compliance with the statutory section. 235 F.3d at 918.

**4.** It is recognized that contrary authority exists. *See, e.g., Am. Soc'y of Consultant Pharmacists v. Concannon*, 214 F.Supp.2d 23, 27–28 (D.Me.2002).

**5.** The position taken by *Ferguson, Houstoun*, and *Hood* is by no means unanimous. *See Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen*, 93 F.3d 997, 1004 (1st Cir.1996); *Methodist Hosp., Inc. v. Sullivan*, 91 F.3d 1026, 1029 (7th Cir.1996); *Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 526 (8th Cir.1993).

therefore apparent from the statutory language that the intended beneficiaries of Section 30(A) are recipients, not providers.

*Houstoun,* 283 F.3d at 538.[6]

### (iii). 42 U.S.C. § 1396r

■ Also prominently mentioned by plaintiffs is 42 U.S.C. § 1396r(b)(1)(A)-(2), which provides that:

A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident.

\* \* \* \* \* \*

A nursing facility must provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care.

The Second Circuit has held that, by itself, § 1396r does not create a federally enforceable right because it "was obviously intended to benefit Medicaid beneficiaries, not providers." *See Concourse Rehab. & Nursing Ctr., Inc. v. Whalen,* 249 F.3d 136, 144 (2d Cir.2001). Plaintiffs attempt to evade this holding by propping up § 1396r with the substantive and procedural guarantees of the repealed Boren Amendment, claiming that "defendants have not provided New York nursing facilities with sufficient reimbursement to comply with these standards, as required under the Boren Amendment." (Docket No. 59, p. 25.) As noted, however, plaintiffs' claims relating to the Boren Amendment

can only be redressed by retrospective declaratory relief, and are therefore barred. It follows, then, that sub-claims asserted in conjunction with and reliance on the Boren Amendment claims must also be dismissed.

### b. federal regulations

■ Plaintiffs also assert several claims based on rights purportedly conferred by federal regulations promulgated pursuant to the Medicaid Act. While the Second Circuit has yet to resolve whether a regulation, standing alone, can provide a right enforceable through § 1983, *King v. Town of Hempstead,* 161 F.3d 112, 115 (2d Cir. 1998) (per curiam); *see also Rodriguez v. City of New York,* 197 F.3d 611, 617 (2d Cir.1999) (assuming, *arguendo,* that a claim based on Medicaid Act regulations was cognizable under § 1983), the majority of circuits have answered the question in the negative where there is an absence of any implicit recognition of an enforceable right in the regulation's enforcing statute, *compare Save Our Valley v. Sound Transit,* 335 F.3d 932, 939 (9th Cir.2003); *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.,* 274 F.3d 771, 784 (3d Cir. 2001); *Allen,* 238 F.3d at 277; *Harris v. James,* 127 F.3d 993, 1008 (11th Cir.1997), *with Loschiavo v. City of Dearborn,* 33 F.3d 548 (6th Cir.1994); *Samuels v. D.C.,* 770 F.2d 184 (D.C.Cir.1985). Because, as noted *supra,* the statutory sections under which the regulations cited by plaintiffs unequivocally confer no federally enforceable right, the majority view of the Cir-

---

**6.** The Fifth Circuit in *Hood* used similar language:

[S]ection 30(A) does *not* create an individual entitlement in favor of any provider. The section benefits recipients by ensuring there is an adequate number of providers in the marketplace. Therefore, it may be true that health care providers as a group are indirectly benefited by section 30(A) because

the section requires that the payments to providers be sufficient to ensure that Medicaid recipients have equal access to medical care. But it cannot be said that section 30(A) necessarily confers upon each provider an individual right to a particular payment because the section does not focus directly on providers.

235 F.3d at 928–29 (emphasis in original).

cuits is adopted in the narrow circumstances of this case and the claims based solely on the cited federal regulations, *see supra* note 1, will be dismissed.

In sum, none of the non-Boren Amendment claims asserted by plaintiffs provide for a federal right enforceable by providers pursuant to § 1983. Accordingly, the substantive merits of such claims need not be addressed.

### C. Constitutional Claims

In addition to basing several causes of action on the Medicaid Act and its attendant regulations, plaintiffs also claim that the challenged measures violate their rights to substantive and procedural due process, and equal protection. All three claims fail as a matter of law.

#### 1. Procedural Due Process

■ To prevail on its procedural due process claim, plaintiffs must demonstrate, *inter alia*, the existence of a constitutionally protected property interest. *See Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998). "Such property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Luck v. Mazzone*, 52 F.3d 475, 477 (2d Cir.1995) (internal quotations and citation omitted).

Plaintiffs do not seem to dispute defendants' contention that they have no constitutionally protected interest "in continued payment at a given reimbursement rate." (Docket No. 54, p. 45; Docket No. 79, p. 17.) Rather, plaintiffs contend that they have a constitutionally protected interest in "sufficient reimbursement going forward to meet the costs associated with caring for their Medicaid residents[.]" (Docket No. 79, p. 17.) However, it is

clear that "sufficient reimbursement" can only be reasonably read as tied to a certain reimbursement rate, and providers "have no property interest in future reimbursements under New York law." *Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir.1984). Thus, plaintiffs' due process claim(s) must be dismissed.

#### 2. Substantive Due Process

■ Plaintiffs claim that defendants have infringed upon their right to substantive due process by utilizing certain of the challenged budgetary measures. "Substantive due process rights guard against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective. Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir.1999) (internal quotations and citations omitted).

Under no view of the facts can defendants' actions be considered "egregious" or "without any reasonable justification." The avowed purpose of enacting the measures was to balance the budget by, *inter alia*, control of Medicaid costs. Such a purpose is indeed a legitimate and laudable objective of the State, *see infra*, and the resulting measures cannot form the basis of a substantive due process claim.[7]

#### 3. Equal Protection

■ Plaintiffs also claim that certain challenged measures violate their equal protection rights, arguing that the measures disproportionately impact some providers. There is no dispute that any challenged measure is subject to the "rational basis" level of review. Thus, the measures

7. Likewise, to the extent plaintiffs assert as a separate federal cause of action that the measures were enacted in an arbitrary and capricious manner, such a claim will also be dismissed.

"must be upheld against equal protection challenge if there is any reasonable conceivable state of facts that could provide a basis for the classification." *Connolly v. McCall,* 254 F.3d 36, 42 (2d Cir.2001) (per curiam) (internal quotations and citation omitted). Indeed, that a federal court is empowered to entertain an equal protection claim "is not a license ... to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

Assuming without deciding that plaintiffs have demonstrated that the challenged measures create classifications among facilities, and have identified the proper contours of such classifications, the equal protection claim still fails as a matter of law. Here, "[t]he parties do not dispute that the purpose of the [challenged measures] is to contain Medicaid costs. Preserving the financial integrity of welfare programs is a legitimate state interest." *Ass'n of Residential Res. in Minn., Inc. v. Gomez,* 51 F.3d 137, 141 (8th Cir. 1995); *see also Pharm. Research & Mfrs. of Am. v. Walsh,* 538 U.S. 644, 666, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) ("The fact that a State's decision to curtail Medicaid benefits may have been motivated by a state policy unrelated to the Medicaid Act does not limit the scope of its broad discretion to define the package of benefits it will finance"); *Alexander v. Choate,* 469 U.S. 287, 303, 306, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (rejecting challenge to cost-saving measure that reduced number of annual days of inpatient hospital care for Medicaid patients). Therefore, plaintiffs' equal protection claim will be dismissed.

### D. State Law Claims

Because no federal claims remain in this case, supplemental jurisdiction is declined over any remaining state law claims.

## IV. CONCLUSION

Plaintiffs' § 1983 claims based on Medicaid Act statutory sections and regulations must be dismissed. To the extent plaintiffs assert claims under the now-repealed Boren Amendment, such claims must be dismissed because any relief gained therefrom would be retrospective. To the extent plaintiffs assert claims under the other Medicaid statutory sections and regulations cited in the pleadings, such claims must be dismissed for failure to grant providers a federally enforceable right. Plaintiffs' constitutional claims must also be dismissed.

Accordingly, it is

ORDERED that

1. Plaintiffs' motion for summary judgment is DENIED;

2. Defendants' motion for summary judgment is GRANTED on all federal claims;

3. Plaintiffs' federal claims are DISMISSED with prejudice; and

4. Plaintiffs' state claims are DISMISSED without prejudice; and

The Clerk is directed to enter judgment accordingly, and dismiss the complaints in Docket Nos. 95–CV–1504, 96–CV–1934, 99–CV–2143, 00–CV–1172, and 03–CV–1132.

IT IS SO ORDERED.