891 A.2d 641

IN THE MATTER OF HOSPITALS' PETITIONS FOR ADJUSTMENT OF RATES FOR REIMBURSEMENT OF INPATIENT SERVICES TO MEDICAID BENEFICIARIES.

Superior Court of New Jersey
Appellate Division

Argued January 10, 2006—Decided February 17, 2006.

Before Judges AXELRAD, PAYNE and SABATINO.

*Paul R. Murphy* argued the cause for appellants Atlantic City Medical Center, Barnert Hospital, Capital Health System at Fuld, Capital Health System at Mercer, Cathedral Healthcare System (St. Michaels/ St. James), CentraState Healthcare System, Colum-

bus Hospital, Cooper Hospital/ University Medical Center, Deborah Heart & Lung Center, Hackettstown Community Hospital, Hospital Center at Orange, Liberty Health System–Greenville Hospital, Liberty Healthcare System–Jersey City Medical Center, Liberty Healthcare System–Meadowlands Hospital, Our Lady of Lourdes, Rancocas Valley/Zurbrugg, Raritan Bay Medical Center, Somerset Medical Center, St. Clare's Hospital at Dover, St. Clare's Hospital at Riverside/Denville, St. Clare's Hospital at Wallkill Valley, St. Francis Hospital–Jersey City, St. Francis Medical Center–Trenton, St. Mary's Hospital–Hoboken, St. Mary's Hospital–Passaic, St. Peter's University Hospital, UMDNJ–University Hospital, Englewood Hospital (*Kalison, McBride, Jackson & Murphy* attorneys; *Mr. Murphy,* of counsel; *Mr. Murphy, James A. Robertson, Barry Liss, and John J. Deno,* on the brief).

*Steven B. Roosa* argued the cause for appellants Mountainside Hospital, Morristown Memorial Hospital, Overlook Hospital, General Hospital Center at Passaic, Palisades Medical Center, Palisades General Hospital, St. Francis Hospital–Jersey City, St. Mary's Hospital–Hoboken, St. Mary's Hospital–Passaic, University Hospital–UMDNJ, St. Elizabeth Hospital, Elizabeth General, Trinitas Hospital, Cooper Health System, Christ Hospital, Kennedy Health System and Kennedy Memorial Hospital (*Reed Smith* attorneys; *Murray J. Klein,* of counsel; *Mr. Klein and Mr. Roosa,* on the brief).

*Phyllis D. Thompson,* of Covington & Burling, a member of the D.C. bar, admitted pro hac vice, argued the cause for respondent Division of Medical Assistance and Health Services (*Peter C. Harvey,* Attorney General attorney; *Michael Haas,* Assistant Attorney General, and *Ms. Thompson* of counsel; *Steven L. Scher,* Senior Deputy Attorney General and *Ms. Thompson,* on the brief).

The opinion of the court was delivered by

PAYNE, J.A.D.

In these consolidated appeals, a substantial number of New Jersey acute care hospitals that participate in the Medicaid pro-

gram and also receive supplemental payments because they serve a disproportionate share of the State's indigent population challenge final administrative determinations by the Division of Medical Assistance and Health Services (Division) denying their rate appeals. The Division found that none had sustained a marginal loss pursuant to *N.J.A.C.* 10:52–9.1(b)2 as the result of providing inpatient services to Medicaid and NJ FamilyCare–Plan A [1] recipients at rates established for the years 1996 to 2001, and thus rate relief was not warranted.

On appeal, the hospitals contend the Division acted arbitrarily, in violation of existing regulations and in violation of the rulemaking requirements of the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –15, by (1) recognizing as "Medicaid reimbursement for inpatient services" revenues received as the result of the provision of indigent and other services and limiting marginal costs when determining whether a marginal loss had been demonstrated warranting rate relief and (2) utilizing only the hospitals' Medicare Cost Reports (MCRs) to demonstrate marginal costs associated with inpatient treatment of Medicaid beneficiaries and failing to consider the hospitals' Standard Hospital Accounting and Rate Evaluation (SHARE) reports. In addition, the hospitals claim that their administrative due process rights to fundamental fairness were violated as the result of alleged multiple changes in rate appeal criteria, in violation of the express terms of applicable regulations and in the absence of new regulations. They claim that the Division's conduct from 1996, when the first appeal was filed, to 2004, when final agency decisions were made, was designed to ensure that no hospital could successfully appeal its Medicaid inpatient fee-for-service rates.

This appeal represents a further iteration of disputes between the hospitals and the Division regarding Medicaid reimbursement rates that commenced in 1995 and, eleven years later, remain

---

[1] This program was previously known as NJ KidCare–Plan A. The terms will be utilized interchangeably.

unresolved.[2] At issue in the present appeal is how revenue and costs are to be calculated under *N.J.A.C.* 10:52–9.1(b)2 for purposes of determining whether the appellant hospitals sustained a "marginal loss" as the result of incremental costs incurred in providing inpatient services to Medicaid and NJ FamilyCare–Plan A fee-for-service beneficiaries, thereby entitling the hospitals to rate relief in the years 1996 through 2001.

*N.J.A.C.* 10:52–9.01(b)2, the regulation in question, provided in 1995 that:

> The Division will not approve an increase in a hospital's rates unless the hospital demonstrates that it would sustain a *marginal loss* in providing inpatient services to Medicaid recipients *at the rates under appeal* even if it were an economically and efficiently operated hospital.

(Emphasis supplied.)

A definition of "marginal loss," absent from the 1995 regulation, was added in amendments proposed in September 1996 in order to "standardize the accounting practices of hospitals in relation to Medicaid." 28 *N.J.R.* 4022(a), 4023 (September 3, 1996). The regulation as adopted in January 1997 provided:

---

2 *See New Jersey Hosp. Ass'n v. Waldman*, 73 *F.*3d 509 (3d Cir.1995) (rejecting a challenge to 1995 revised Medicaid reimbursement rate-setting procedures as violating federal law); *Hosp. Ctr. at Orange v. Guhl*, 331 *N.J.Super.* 322, 751 *A.*2d 1077 (App.Div.2000) (finding the Division's three-year delay in deciding rate appeals for the years 1996, 1997 and 1998 to have violated the *Division's* statutory responsibilities and imposing a requirement that such appeals be decided within a reasonable time); *In re Zurbrugg Mem. Hosp.*, 349 *N.J.Super.* 27, 793 *A.*2d 17 (App.Div.2002) (finding the Division's summary rejection of hospital appeals from 1995 rates on the basis of incomplete information to have been arbitrary and capricious and requiring an "interactive process" between the Division and the hospitals to cure any documentary deficiencies); *Atlantic City Med. Ctr. v. Squarrell*, 349 *N.J.Super.* 16, 793 *A.*2d 10 (App.Div.2002) (remanding appeals of 1997 rates because the Division failed to provide reasons for its decisions); *United Hosps. Med. Ctr. v. State of N.J.*, 349 *N.J.Super.* 1, 793 *A.*2d 1 (App.Div.2002) (finding regulations governing Medicaid reimbursement rates for inpatient hospital care conformed to then-existing federal law). *See also Besler & Co. v. Bradley*, 361 *N.J.Super.* 168, 824 *A.*2d 289 (App.Div.2003) (reversing as arbitrary the Division's determination to reject 2002 appeals filed through the hospitals' agent and to require direct submission by the hospitals).

> *Marginal loss* is the amount by which a hospital's rate year's *Medicaid reimbursement for inpatient services* is expected to fall short of the incremental costs, defined as the variable or additional out-of-pocket costs, that the hospital expects to incur providing inpatient hospital services to Medicaid patients during the rate year. These incremental costs are over and above the inpatient costs the hospital would expect to incur during the rate year even if it did not provide service to Medicaid patients.
>
> [29 *N.J.R.* 350(b), 355 (January 21, 1997); *N.J.A.C.* 10:52–9.1(b)(2) (1997) (emphasis supplied).]

A further amendment in 2000 added NJ KidCare–Plan A fee-for-service beneficiaries to Medicaid beneficiaries as the recipients of services included within the ambit of the marginal loss calculation. 31 *N.J.R.* 3151(a), 3179 (Nov. 1, 1999); 32 *N.J.R.* 276, 297 (Jan. 18, 2000).[3]

In accordance with *N.J.A.C.* 10:52–9.1(b)2, in order to prevail on a rate appeal, a hospital must demonstrate (1) that it would sustain a "marginal loss" in providing inpatient services to Medicaid fee-for-service beneficiaries at the rates under appeal even if it were an economically and efficiently operated hospital; (2) the cost it must incur in providing services to Medicaid recipients; and (3) the extent to which it has taken all reasonable steps to contain or reduce the costs of providing inpatient hospital services. *In re Zurbrugg Mem. Hosp.*, 349 *N.J.Super.* 27, 31, 793 *A.*2d 17 (App.Div.2002).

---

[3] The regulation was further amended while this appeal was pending, effective July 5, 2005, 37 *N.J.R.* 3151(a) and 37 *N.J.R.* 2506(a), to provide the following definition of marginal loss:

> Marginal loss is the amount by which a hospital's rate year's Medicaid and NJ FamilyCare–Plan A fee-for-service reimbursement for inpatient services including Graduate Medical Education (GME) and Disproportionate Share Hospital (DSH) payments is expected to fall short of the incremental costs, defined as the variable or additional out of pocket costs, that the hospital expects to incur providing inpatient hospital services to Medicaid and NJ FamilyCare–Plan A fee-for-service patients during the rate year....

Issues surrounding the adoption of this amendment are the subject of a separate appeal. *In re Adoption of Amendments to N.J.A.C. 10:52,* Docket No. A–6649–04T3.

The hospitals argue that because the regulation requires that they demonstrate a marginal loss at the "rates under appeal," they are entitled to an increase in rates whenever their marginal costs exceed the per-patient reimbursement that they receive pursuant to the diagnostic related group (DRG) methodology set forth in *N.J.A.C.* 10:52–4.1 through 10:52–7.3. The Division acknowledges that the "rates under appeal" constitute the per-patient DRG rates. However, the Division argues that, when calculating marginal loss, the hospitals must include as revenue their entire "Medicaid reimbursement for inpatient services," a sum that includes not only DRG reimbursements but also the lump-sum payments that the hospitals receive as Medicaid rate supplements because they serve a disproportionate share of the State's indigent population. Under the hospitals' methodology, a rate increase would be virtually assured; under the Division's methodology, a rate increase would be unlikely.

I.

The parties' dispute over the proper interpretation of "rates under appeal" and "Medicaid reimbursement for inpatient services" as they relate to marginal loss calculations can be resolved only by reference to the manner in which Medicaid payments are calculated under federal law, a subject that requires a somewhat lengthy explanation. Medicaid is a joint federal-state program, in which New Jersey participates, established by Title XIX of the Social Security Act to provide medical assistance on behalf of certain categories of persons whose income and resources are insufficient to meet the costs of necessary medical services. 42 *U.S.C.A.* §§ 1396, 1396a to 1396v. As a participant, the State is required to comply with federal Medicaid statutes and regulations. *Harris v. McRae*, 448 *U.S.* 297, 301, 100 *S.Ct.* 2671, 2680, 65 *L.Ed.*2d 784, 794 (1980).

The Medicaid program is administered federally by the Department of Health and Human Services, and at times relevant to this appeal, such administration occurred through the Health Care

Financing Administration (HCFA). It is administered in New Jersey by the Division of Medical Assistance and Health Services in the State's Department of Human Services. 42 *U.S.C.A.* § 1396a(a)(5); *N.J.S.A.* 30:4D–4, –5. The New Jersey Medical Assistance and Health Services Act, *N.J.S.A.* 30:4D–1 to –19.2, and associated regulations, *N.J.A.C.* 10:52–1.1 to 13.7, implement the State's component of the statutory scheme.

Federal law requires New Jersey, as a participating state, to submit for federal approval a Medicaid State Plan that, among other things, describes the methods and standards for reimbursement of providers of Medicaid services. 42 *U.S.C.A.* §§ 1396, 1396a(a)(13); *N.J.S.A.* 30:4D–7a. The methodology can be found in Attachment 4.19–A of the Plan. Approval of the State Plan by the Secretary of the Department of Health and Human Services permits receipt of federal matching funds for amounts spent as medical assistance in accordance with the State Plan. 42 *U.S.C.A.* § 1396b. Over the years, New Jersey has submitted amendments to its State Plan, each of which has been federally approved.

Until 1981, reimbursement to Medicaid-eligible hospitals was based on the "reasonable costs" of services actually provided to Medicaid inpatients, regardless of variances in those costs or the extent of efficiencies realized. *See United Hosps. Med. Ctr. v. State of N.J.,* 349 *N.J.Super.* 1, 5, 793 *A.2d* 1 (App.Div.2002) (describing federal statutory history). In 1981, Congress sought to limit the rapidly increasing costs of inpatient hospital care and other medical services and to allow the states more flexibility in designing Medicaid programs by enacting the Boren Amendment as part of the 1981 Omnibus Budget Reconciliation Act, Pub.L. No. 97–35. Under that amendment, states were required to pay rates that were "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 *U.S.C.A.* 1396a(a)(13)(A)(repealed 1997).[4] *See United*

---

[4] *See* Balanced Budget Act of 1997, Pub.L. No. 105–33 § 4711, 11 Stat. 251, 507–08.

*Hosps. Med. Ctr., supra,* 349 *N.J.Super.* at 5, 793 *A.*2d 1 (describing Boren Amendment); *see also Children's Seashore House v. Waldman,* 197 *F.*3d 654, 656 (3d Cir.1999), *cert. denied, sub. nom, Children's Seashore House v. Guhl,* 530 *U.S.* 1275, 120 *S.Ct.* 2742, 147 *L.Ed.*2d 1006 (2000); *New Jersey Hosp. Ass'n v. Waldman,* 73 *F.*3d 509, 511–12 (3d Cir.1995).

However, at that time, it was recognized that a reduction in Medicaid reimbursement rates could adversely affect hospitals that served a "large volume of Medicaid patients and patients who are not covered by other third party payors." H.R.Rep. No. 97–158, 97th Cong., 1st Sess. 294–96 (1981). In order to assure the continued existence of reasonably accessible, quality care to Medicaid patients, the Congress required that the states "in determining the appropriate reimbursement rate for inpatient hospital services, . . . take into account the special costs of hospitals whose patient populations are disproportionally composed of" Medicaid recipients or uninsured patients. *Id.* at 295; *see also New Jersey Hosp. Ass'n, supra,* 73 *F.*3d at 514. These hospitals are known as disproportionate share hospitals (DSH hospitals).

Because supplemental payments to DSH hospitals provide insurance against hospital closure and thus a reduction in services to a state's Medicaid population, those payments may exceed the cost of furnishing hospital services under Medicaid and may include the costs of serving the uninsured indigent. 42 *U.S.C.A.* § 1396r–4(g)(1)(A).

The recognition of a need for payment adjustments to disproportionate share hospitals as the result of the nature of their patient populations continued after repeal of the Boren Amendment in 1997.[5] 42 *U.S.C.A.* § 1396a, governing the content of State Plans, requires that Medicaid reimbursement rates for

---

[5] The 1997 amendment to 42 *U.S.C.A.* § 1396a(a)(13)(A) "replaced the Boren Amendment's language requiring a state to pay 'reasonable and adequate' rates with language mandating that a state provide a 'public process' by which rates are determined in accordance with [42 *U.S.C.A.* § 1396r–4]." *Children's Seashore, supra,* 197 *F.*3d at 656.

hospitals "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 *U.S.C.A.* § 1396a(a)(13)(A)(iv).

42 *U.S.C.A.* § 1396r–4, a definitional section that was cross-referenced by 42 *U.S.C.A.* § 1396a(a)(13)(A) under the Boren Amendment and after its repeal, in turn states that a State plan will not be considered to meet the requirements of section 1396(a)(13)(A)(iv) unless it defines disproportionate share hospitals in accordance with subsection (b)(1), which defines such hospitals in terms of their Medicaid inpatient utilization rate or low-income utilization rate. 42 *U.S.C.A.* § 1396r–4(a)(1)(A) and –4(b)(1)(A) and (B). However, no hospital may receive DSH payments unless it has a Medicaid inpatient utilization rate of at least one percent. 42 *U.S.C.A.* § 1396r–4(d)(3).

Significantly, in subsection –4(a)(1)(B), the statute provides that a State Plan shall not be considered to meet the requirements of section 1396a(a)(13)(A)(iv) unless the Plan

(B) provides, *effective for inpatient hospital services* . . . for an appropriate increase in the rate or amount of payment for such services provided by such hospitals, consistent with subsection (c) of this section.

[42 *U.S.C.A.* § 1396r–4(a)(1)(B) (emphasis supplied).]

However, subsection –4(c), which provides three methods for calculating DSH adjustments, does not limit the calculus only to a consideration of inpatient hospital services provided to Medicaid recipients by hospitals entitled to DSH payments; it also includes other services.[6] Moreover, once a hospital qualifies for DSH payments, the hospital can use those payments for any purpose. *Children's Seashore House, supra,* 197 *F.*3d at 661. Although HCFA has recognized that state plans may base DSH payments on the amount of charity care days or on other factors that are not directly related to Medicaid, a DSH payment "is not a payment for

---

[6] DSH payments can be calculated as a percentage of the hospital's basic Medicaid DRG rates, 42 *U.S.C.A.* § 13964r–4(c)(1) or as lump sum amounts that depend on the cost, volume or proportion of inpatient services to Medicaid or other low-income patients. 42 *U.S.C.A.* § 1396r–4(c)(2) and (3).

those days." HCFA, Attachment to "Intermediaries Program Memorandum Transmittal No. A–00–62" (effective January 1, 2000).

Amendments to New Jersey's State Plan, approved on September 22, 1997, specify calculation of minimum DSH adjustments as a percentage of "non-DSH Medicaid payments for inpatient services," and limit DSH adjustments to the sum of the hospital's "Medicaid shortfall" (the cost of services to Medicaid patients less the non-DSH payments made under the State Plan) and its "Uninsured Patient Cost" (the net cost of services to those without health insurance or other third-party coverage). *State Plan Under Title XIX of the Social Security Act,* Attachment 4.19A at I–261 to –261.1. The amendments also describe the components of DSH adjustments entitled to federal matching funds as including payments from a variety of funds administered by the Department of Health and Senior Services (DHSS) and the Department of Human Services (DHS) [7]: a charity care subsidy from the DHSS's Health Care Subsidy Fund, *id* at I–262 [8]; a subsidy from the DHSS's Other Uncompensated Care Hospital Subsidy Fund, *id.* at I–263 [9]; a subsidy for treatment of HIV, mental health, substance abuse, complex neonates, tuberculosis and mothers with substance abuse from the DHS's Hospital Relief Subsidy Fund (HRSF), *id.* at I–265 [10]; and a subsidy from the DHS's Hospital Relief Subsidy Fund for the Mentally Ill and Developmentally Disabled, *id.* at I–267.[11]

---

[7] Medicaid payments may be derived from Medicaid agency (DHS) appropriations or may be payments from appropriations to other agencies such as DHSS that are certified as Medicaid expenditures. 42 *C.F.R.* 433.51(b).

[8] *See N.J.S.A.* 26:2H–18.52 and –18.59; *N.J.A.C.* 10:52–13.4.

[9] *See N.J.S.A.* 26:2H–18.52, –18.61.

[10] *See N.J.A.C.* 10:52–13.5.

[11] *See N.J.A.C.* 10:52–13.6.

Regardless of whether a hospital qualifies as a disproportionate share hospital, it receives reimbursement for inpatient services rendered to Medicaid patients, calculated in accordance with standard reimbursement rates established at least yearly for each Diagnosis Related Group (DRG) pursuant to *N.J.A.C.* 10:52–4.1 through 7.3. *See also United Hosps. Med. Ctr., supra,* 349 *N.J.Super.* at 5–7, 793 *A.*2d 1 (discussing changes in DRG calculations and finding them consistent with federal law). In the case of disproportionate share hospitals, DSH payments serve to increase the overall rate of payment. Although DSH payments are not tied specifically to inpatient services provided to identified patients, in that they do not increase DRG rates applicable to those patients, their payment is associated solely with inpatient care to the Medicaid eligible. *County of Camden v. Waldman,* 292 *N.J.Super.* 268, 678 *A.*2d 1101 (App.Div.1996), *certif. denied,* 149 *N.J.* 140, 693 *A.*2d 109 (1997).

As we stated in *County of Camden* in the context of a challenge by counties to state utilization of federal DSH funds based on the argument that the funds constituted assets of individuals to whom treatment was afforded:

> Though this funding is provided under the auspices of the Medicaid system, DSH payments are not "Medicaid payments" in the sense that they cover identifiable costs of individual patients.... Rather, DSH payments help to cover the extraordinary costs of those hospitals which serve a particularly high number of indigent patients, whether Medicaid- and Medicare-eligible or not, and they are tied to the State's obligation to consider the exceptional situation of those hospitals. Thus, DSH payments are designed to address the special financial plight of the hospitals which serve a high volume of indigent patients; they are not addressed to the special financial plight of any individual patients.
>
> [*Id.* at 281–82, 678 *A.*2d 1101.]

Because of the statutory origin of DSH payments as an element of inpatient Medicaid reimbursement unassociated with an individual patient, in *County of Camden,* we rejected claims by fourteen counties to those funds as compensation for their payments to psychiatric facilities and developmental centers involved in the care of mentally ill or developmentally disabled persons who were medically indigent, finding that such funds, unlike social security

payments, did not constitute a part of a patient's estate subject to recoupment by the counties. *Id.* at 279–84, 678 *A.*2d 1101. Of significance here, in doing so, we relied, in part, on the definition of DSH payments given by the New Jersey Director of Medical Assistance and Health Services as they related to factors including patient and hospital reimbursement by Medicaid. The Director determined them, in relevant part, to be related solely to inpatient care provided to Medicaid eligible patients, stating:

a) Patient reimbursement by Medicaid

Disproportionate share payment adjustments are additional payments made to hospitals that are providing inpatient care to low-income patients (also called charity care). By definition, charity care is hospital care provided to individual patients who have no source of payment (including Medicaid), third-party insurance, or personal resources. Therefore, patient reimbursement by Medicaid is guided by the relevant provisions of Title XIX of the Social Security Act and the approved New Jersey Medicaid State Plan and is unaffected by disproportionate share payment adjustments. Nevertheless, actual disproportionate share payment adjustments could be made as an add-on to such patient per diem reimbursement rates.

b) Hospital reimbursement by Medicaid

*Disproportionate share payment adjustments are payments made to hospitals over-and-above the normal payments to hospitals for inpatient care provided to Medicaid eligible patients. . . .*

[*Id.* at 282, 678 *A.*2d 1101 (quoting *Joint Select Committee on Medicaid Reimbursement*: "To take testimony from invited individuals from the Department of Human Services regarding the application made by the Department for Medicaid uncompensated care retroactive claims, to July 1, 1988, for disproportionate share payments for State and county psychiatric hospitals," October 20, 1992, Memorandum and Attachment 1 by Saul M. Kilstein, Director of Medical Assistance and Health Services) (emphasis supplied).]

*See also Evergreen Presbyterian Ministries v. Hood,* 235 *F.*3d 908, 923 (5th Cir.2000) ("Under a plain reading of section 13(A), the 'rates' are required to take into account the situation of DHSs" and DHS payments are to be credited against otherwise unreimbursed Medicaid costs); *Osteopathic Hosp. Founders Ass'n, Inc. v. Splinter,* 955 *F.Supp.* 1351, 1354 (N.D.Okla.1996) (recognizing DSH payments as an addition to base reimbursement rates).[12]

---

[12] Hospitals, if eligible, are also entitled as part of their DSH payments to Graduate Medical Education (GME) and Indirect Medical Education (IME)

Rates are set within this regulatory context. A hospital may seek an adjustment to its DRG rates pursuant to *N.J.A.C.* 10:52–9.1(b) by submitting a request for rate review.[13] However, the Division will not approve an increase in a hospital's rates unless the hospital demonstrates that it would sustain a "marginal loss in providing inpatient services to Medicaid and NJ FamilyCare–Plan A fee-for-service beneficiaries at the rates under appeal even if it were an economically and efficiently operated hospital." *N.J.A.C.* 10:52–9.1(b)2.

The use of the marginal loss concept was discussed by the Division in response to hospital comments on proposed revised reimbursement regulations, adopted in January 1997 to accord with the Boren Amendment. 29 *N.J.R.* 350(a), 353 (January 21, 1997) ("Changes in Reimbursement Methodology for Hospitals: Graduate Medical Education (GME), Indirect Medical Education (IME), and Inpatient Services"); *see also United Hosps. Med. Ctr., supra,* 349 *N.J.Super.* at 5–6, 793 *A.*2d 1 (giving regulatory history). The Division stated:

> The Boren Amendment requires States to pay rates that they find are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated hospitals and to assure reasonable access to inpatient hospital services of adequate quality for Medicaid beneficiaries. The Boren Amendment does not define the term "costs which must be incurred," but leaves that determination to the states.
>
> * * *
>
> The [Division's] intent [in its use of the concept of "marginal loss"] is to assure that each efficiently and economically operated hospital is, at a minimum, reimbursed

reimbursements calculated pursuant to *N.J.A.C.* 10:52–8.1 and distributed pursuant to *N.J.A.C.* 10:52–8.2; *see also N.J.A.C.* 10:52–13.4(d). Federal law does not dictate how a state must take into account GME and IME costs in establishing payment rates for hospital inpatient services rendered to Medicaid beneficiaries. GME and IME expenses were removed from a hospital's Medicaid inpatient DRG rates for services rendered after October 1, 1996. 28 *N.J.R.* 4022(a), 4023 (September 3, 1996); 29 *N.J.R.* 350(b) (January 21, 1997). They are now calculated utilizing a Medicare formula applied to major teaching hospitals and distributed to all teaching hospitals.

[13] Appeals of calculation errors can be prosecuted under *N.J.A.C.* 10:52–9.1(a).

for the incremental costs it incurs to serve Medicaid beneficiaries (that is, the costs that vary with Medicaid volume and thus are costs that the hospital must incur specifically because of its Medicaid patients.) Use of the concept of "marginal loss" in the rate appeals regulation also helps to assure that no hospital is worse off because it treats Medicaid beneficiaries. So long as Medicaid payments meet a hospital's marginal costs and make some contribution to fixed costs, a hospital is better off serving Medicaid beneficiaries than not serving them. The "marginal loss" standard is, therefore, reasonably related to the Boren Amendment goal of assuring that Medicaid beneficiaries have reasonable access to hospital inpatient services.

[29 *N.J.R.* 353.]

## II.

The hospitals, contending that they had sustained marginal losses in one or more years from 1996 to 2001, all filed administrative rate appeals with the Division pursuant to *N.J.A.C.* 10:52–9.1(b). In each case, the Division denied the hospital's appeal after determining that the hospital had not or would not sustain a marginal loss in the relevant period. In making these determinations, the Division relied upon the inpatient Medicaid cost figures contained in the hospitals' MCRs and it considered as revenue the hospital relief subsidy fund (HRSF) component of their DSH subsidies. The Division's determinations were appealed pursuant to *N.J.A.C.* 10:52–9.1(d), and the matters were transferred to the Office of Administrative Law, where they were consolidated for consideration by an Administrative Law Judge (ALJ).[14]

While matters were pending before the ALJ, in 2002 we determined a challenge to the Division's denial of all rate appeals for the year 1995. *See In re Zurbrugg Mem. Hosp., supra,* 349 *N.J.Super.* 27, 793 *A.2d* 17. The Division had taken the position that in order to prevail on a rate appeal, the hospital was required

---

[14] The hospitals also filed appeals of calculation errors related to their rates that were rejected by the Division. In *Atlantic City Med. Ctr. v. Squarrell,* we remanded the appeals filed from the Division's determinations finding that the Division had failed to provide a clear statement of the basis for its decisions. 349 *N.J.Super.* at 25, 793 *A.2d* 10. Those alleged calculation errors are not at issue in this appeal.

to submit documentation establishing (1) the cost it must incur in providing services to Medicaid patients; (2) whether the hospital had taken all reasonable steps to contain or reduce its costs; and (3) whether the hospital demonstrated that it would sustain a marginal loss in providing inpatient Medicaid services at the rates under appeal. *Id.* at 33, 793 *A.*2d 17. Although we found the Division's statutory interpretation to have been correct, we found that the Division's summary denial of the hospitals' appeals on the ground of insufficient evidence was arbitrary and capricious and an abdication of the Division's responsibility to consider the appeals on the merits. *Id.* at 35, 793 *A.*2d 17. We stated:

> We do not disagree, in principle, with the Division that the initial submission must address the three core issues identified by the regulations, but that does not end the inquiry or the "interaction" between the parties. The dilemma faced by a hospital here is that the regulatory process enabled by *N.J.A.C.* 10:52–9.1 is so flawed that compliance becomes a matter of chance rather than one that is carefully enunciated and systematic.
>
> The deficiencies in the lack of definition in the regulation in effect at the time of consideration of these appeals supports this view. Critical to any analysis of the rate appeals is the concept of "marginal loss," a term not defined in the 1995 regulations. "Marginal loss" is neither self-explanatory nor self-defining. The difficulties resulting from this lack of definition become most apparent in the context of the Division's determination to reject appeals based on a hospital's failure to establish "marginal loss." In declining to consider some of the rate appeals, the Division concluded that the inclusion of fixed costs as an element of marginal loss was inappropriate. The Division did not suggest that such inclusion would prompt further inquiry and revision of a submission, but that it would bar substantive review.

[*Id.* at 36–37, 793 *A.*2d 17 (footnote omitted).]

Because of the flaws that we perceived to exist in the implementation of *N.J.A.C.* 10:52–9.1(b)2 as it existed in 1995, we found that "substantial justice will best be served by starting the process anew and allowing the hospitals to make a full submission of documentation consistent with the three core issues identified and, if found to be deficient, then requiring the agency to respond in kind by delineating such documentation that it requires to properly consider the rate appeals." *Id.* at 39, 793 *A.*2d 17. The appeals were thus remanded for the required "interactive process" to occur. These appeals remain undecided at the agency level.

After our decision in *Zurbrugg* had been filed, cross-motions for summary decision were filed by the hospitals and the Division in the present matters. The hospitals argued that the Division had failed to comply with the APA, that its actions were arbitrary and capricious, and a remand and reconsideration of whether a marginal loss had been demonstrated was required in light of *Zurbrugg*. The Division asserted that its denials of the appeals should be affirmed on the basis of its marginal loss methodology and its results.

In an opinion dated May 14, 2003, the ALJ accepted the hospitals' argument that the term "marginal loss" was susceptible to different interpretations, and he remanded the appeals to the Division for an interactive process to occur with respect to the evidence necessary to establish that a marginal loss had occurred.

In a final administrative decision by the Division dated September 8, 2003, its Acting Director agreed that the rate appeals should be remanded so that the parties could engage in the interactive process required by *Zurbrugg*. However, he found "ample support" for the Division's use of the hospitals' MCRs as a source of financial information, rather than the SHARE report that the hospitals sought to have utilized. Additionally he found that the Division could use DSH payments in the marginal loss calculation, and he modified the ALJ's opinion in these two respects. Although the ALJ had not determined whether the Division's inclusion of DSH/HRSF funds and use of MCR data without rulemaking violated the APA, the Division's Acting Director addressed the issue, finding that "the clear language and intent of the rate appeal regulations obviates the need for any further rulemaking, and ... there is no violation of the APA. He continued:

> As noted above, *N.J.A.C.* 10:52–9.1(b)(2)(x) specifically identifies the Medicare Cost report as a document the Division may rely upon in the calculation of marginal loss. Moreover, the Division's interpretation that *N.J.A.C.* 10:52–9.1(b) permits it to take into account DSH revenues in the marginal loss calculation is entitled to substantial deference.

The hospitals appealed from those portions of the Division's final decision that differed from the conclusions of the ALJ, without engaging in any interactive process with the Division and without waiting for the Division's final decisions on remand. We granted leave to appeal, but remanded the cases for completion of the interactive process by April 16, 2004. In letters sent by the Division to the hospitals in early February, 2004, it sought any corrections required to Medicaid cost data derived from the hospitals' MCR reports and any additional existing analyses of marginal costs. On April 16, 2004, the rate increase requests were denied as unsupported by evidence of marginal loss. In reaching this conclusion, the Division again utilized the hospital's MCRs as a source of Medicaid cost data, and it included the charity care component of DSH supplements as well as the HRSF component as revenue.

## III.

It is significant to note that in this appeal, the hospitals do not seek a determination whether they actually sustained marginal losses in the periods at issue. Their appeal concerns more fundamentally only the manner in which marginal loss is calculated and the documentation relevant to that calculation.

We address first the hospitals' contention that the only revenues that the Division can consider in determining marginal loss under the regulations existing in 1995 and 1997 are those received pursuant to DRG rates since they constitute the "rates under appeal" to which *N.J.A.C.* 10:52–9.1(b)2 refers. According to the hospitals, the Division inappropriately considered DSH subsidies as "Medicaid reimbursement for inpatient services" because those subsidies are not patient-specific, they are utilized to compensate in part for services provided to persons who are not Medicaid recipients, and they cover outpatient as well as inpatient care. The hospitals also note the failure by the Division to request and consider cost data associated with the use of these distinct DSH funds. They argue, as well, that the Division was

obligated to consider financial projections contained in their SHARE reports in determining marginal loss, and that a focus solely upon MCR data derived from actual costs was arbitrary and capricious.

The Division counters the hospitals' position by arguing that, in accordance with the Boren Amendment and subsequent federal law, as well as New Jersey's State Plan, DSH payments are recognized as a component of a hospital's inpatient Medicaid reimbursement (albeit not allocated to individual patients) that must be considered in determining whether a hospital has sustained a marginal loss as the result of the provision of Medicaid inpatient care. The Division also argues that it was within its discretion to rely upon actual Medicaid inpatient costs data derived from the hospitals' MCR reports, since SHARE reports have not been audited since 1988. *See* 27 *N.J.R.* 912 (March 6, 1995).

█ We reject the hospitals' argument that the Division acted arbitrarily in including DSH revenues when calculating marginal loss pursuant to *N.J.A.C.* 10:52–9.1(b)2, finding that the hospitals have failed to meet their burden of establishing arbitrary or capricious action. *In re Taylor,* 158 *N.J.* 644, 656, 731 *A.2d* 35 (1999); *Brady v. Bd. of Review,* 152 *N.J.* 197, 210–11, 704 *A.2d* 547 (1997); *Matter of Musick,* 143 *N.J.* 206, 216, 670 *A.2d* 11 (1996); *George Harms Constr. Co. v. N.J. Turnpike Auth.,* 137 *N.J.* 8, 27, 644 *A.2d* 76 (1994). *Van Dalen v. Washington Twp.,* 120 *N.J.* 234, 244, 576 *A.2d* 819 (1990). In reaching this conclusion, we recognize that the Division's interpretation of its own marginal loss regulation to permit a recognition of DSH revenue is entitled to great weight, *In re Freshwater Wetlands Protection Act Rules,* 180 *N.J.* 478, 489, 852 *A.2d* 1083 (2004), since the Division is in the best position to understand what was meant by the regulation when it was promulgated.

The federal/state Medicaid program that we have described at the beginning of this opinion contains, at its core, a recognition that the DRG rates paid as reimbursement for individual inpatient Medicaid care may provide inadequate compensation for the costs

of treating Medicaid patients incurred by hospitals providing a disproportionate share of indigent care. Thus, the "appropriate reimbursement rate" (H.R.Rep. No. 97–158, 97th Cong., 1st Sess. 295 (1981)) paid by the federal government as matching funds has, since the early 1980s, included a payment adjustment for such care as an element of inpatient Medicaid reimbursement. Because these Medicaid adjustments constitute a supplement to per-patient DRG inpatient rates applicable to Medicaid recipients, even if those DRG rates prove to be lower than actual costs, total revenue after receipt of any DSH supplements is designed to exceed such costs so that no hospital is worse off as the result of treating Medicaid patients.[15] DSH payments are made to hospitals because they serve a disproportionate share of the indigent. However, 42 *U.S.C.A.* § 1396r–4(a)(1)(B) provides that the increase in rates reflecting DSH payments is effective only for rates applicable to inpatient hospital services to Medicaid patients. That increase thus serves as an incentive to the provision of continued inpatient Medicaid care.

The Division has summarized the relationship between DSH payments and direct reimbursement for inpatient care to Medicaid patients in its response to comments to the most recent amendment to *N.J.A.C.* 10:52–9.1b(2), adopted in 2005, that raise the same arguments as presented by the hospitals here, by stating:

Federal law permits states to set the amount of DSH payments on the basis of the cost or volume of a hospital's services to low-income patients. Nevertheless, DSH payments are not payments for those services (other than services to Medicaid inpatients). Regardless of how DSH payments are calculated or are used by hospitals, DSH payments are Medicaid payments which arise from a hospital's provision of Medicaid inpatient services. DSH payments are the vehicle by which New Jersey's Medicaid inpatient payment rates (DRG rates) take into account the situation of hospitals that serve a disproportionate share of low-income patients with special needs, as required by Federal law. In other words, DSH payments are an adjustment to Medicaid DRG rates and thus an enhancement to Medicaid fee-for-service reimbursement. They recognize that, in order to remain viable to

---

[15] The fact that charity care payments may be inadequate to cover the total costs of charity care is not relevant to whether they constitute Medicaid inpatient rate supplements.

provide access to inpatient care for Medicaid beneficiaries, DSH hospitals may need Medicaid payments in excess of the amounts paid under the DRG median-cost efficiency standard.

The purpose of the marginal loss appeal rule is to assure that no hospital is worse off because it treats Medicaid beneficiaries. A hospital can qualify for DSH payments only if its Medicaid inpatient utilization rate is at least one percent. This means that DSH payments are a benefit that results from participating in the Medicaid program, and therefore should be taken into account in determining whether a hospital is worse off because of its Medicaid program participation. For these reasons, it would be inappropriate to exclude DSH payments from the marginal loss analysis.

[37 *N.J.R.* 2506(a) (July 5, 2005).]

In light of the statutory history that we have set forth, we cannot agree with the hospitals that the Division's interpretation of the marginal loss provisions of *N.J.A.C.* 10:52–9.1(b)2 so as to include DSH payments as revenues for purposes of a marginal loss calculation is arbitrary or capricious. Whatever a hospital's actual use of such payments may be, the Division is statutorily entitled to categorize DSH payments as a form of unallocated reimbursement for inpatient Medicaid care. We find that such a categorization does not violate either express or implied legislative policies and indeed is consistent with them. *See L.M. v. State of N.J. Div. of Med. Assist. & Health Servs.*, 140 *N.J.* 480, 490, 659 *A.*2d 450 (1995) (an "agency's interpretation of the operative law is entitled to prevail, so long as it is not plainly unreasonable") (quoting *Metromedia, Inc. v. Dir., Div. of Taxation*, 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984)).

Although the regulations in effect in 1995 and adopted in 1997 could conceivably be read, as the hospitals contend, to require a comparison of marginal costs only to the amount of DRG reimbursements for inpatient care to Medicaid patients (*e.g.*, the "rates under appeal"), the language of the regulations does not require that interpretation, and it is contrary to abundant authority recognizing that DSH payments are to be considered a component of fee-for-service inpatient reimbursement to eligible hospitals. *N.J.A.C.* 10:52–9.1(b)2 does not state or even suggest that rate adjustments may be made when DRG payments alone fall below marginal costs of providing inpatient services to Medicaid patients.

Thus the Division's interpretation of the marginal loss regulation was not contrary to the terms of that regulation. Indeed, if reimbursements in accordance with DRG rates constituted the only revenue source to be considered in calculating marginal loss, as the hospitals suggest, and rate relief were deemed warranted whenever those rates failed to cover marginal costs, DSH payments would be unnecessary to cover a Medicaid shortfall, since none would ever exist.

We also do not find arbitrary the Division's determination not to subtract the costs of indigent care that is unrelated to Medicaid inpatient treatment from DSH payments in determining marginal loss. Precedent establishes that these payments do not constitute payments for specific services provided to non-Medicaid eligible persons. Thus we find to be reasonable the Division's argument that the costs incurred are not relevant to the marginal loss calculation. The fact that DSH funds may have been used, in part, to provide inpatient and outpatient indigent care in addition to Medicaid-eligible inpatient fee-for-service care does not affect the conclusion, derived from federal statutes, that the funds are Medicaid supplemental allotments and can be considered as such by the Director.[16]

As a final matter, we find that the hospitals have failed to demonstrate that the Division acted arbitrarily and capriciously in utilizing the Medicaid cost data contained in audited hospital MCRs as a basis for its marginal loss calculation. In this regard, we are mindful of the strong presumption of reasonableness that we must accord to the Division's exercise of its statutorily delegated duties, *Van Dalen, supra,* 120 *N.J.* at 244–45, 576 *A.2d* 819, especially in a case such as this in which agency expertise is a

---

[16] We decline to address the argument, presented for the first time in the reply brief of hospitals represented by Kalison, McBride, Jackson & Murphy, that DSH payments apply in part to services provided to Medicaid managed care patients. *See Randolph Town Ctr. L.P. v. County of Morris,* 374 *N.J.Super.* 448, 452 n. 2, 864 *A.2d* 1191 (App.Div.), *certif. granted,* 184 *N.J.* 209, 876 *A.2d* 283 (2005).

significant factor in decisionmaking. *City of Newark v. Natural Res. Council, D.E.P.,* 82 *N.J.* 530, 540, 414 *A.*2d 1304, *cert. denied,* 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980); *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965).

█ In considering this issue, we find it noteworthy that the hospitals do not contend that the data contained in their MCRs is inaccurate, that it fails to fairly set forth variable costs (although they contest the elements of such costs), or that its use is unsanctioned by regulation. The hospitals merely contend that the Division should instead have relied on the projections contained in their SHARE reports. However, they do not present persuasive evidence that such reports are more reliable. That SHARE reports "are standard forms used by hospitals to report their costs to Medicaid and Medicare," *Univ. of Med. & Dentistry of N.J. v. Grant,* 343 *N.J.Super.* 162, 171, 778 *A.*2d 473 (App.Div. 2001), does not render them *ipso facto* superior for the purposes of calculating marginal costs. We thus find no arguments of such countervailing force as to overcome the deference to the Division's decision that we owe in this regard. *City of Newark, supra,* 82 *N.J.* at 540, 414 *A.*2d 1304; *Univ. of Med. & Dentistry of N.J., supra,* 343 *N.J.Super.* at 168–71, 778 *A.*2d 473.

## IV.

█ The hospitals additionally claim that their administrative due process rights to fundamental fairness were denied as the result of the Division's "shifting" application of the marginal loss regulation, and that as a result they were never afforded the opportunity to have their rate appeals heard within a meaningful time and in a meaningful manner.[17] The hospitals claim that, as the result of the Division's responses to their 1995 rate appeals, the hospitals were led to believe that their SHARE cost data

---

[17] The hospitals represented by Reed Smith also assert deprivation of substantive due process. However, they advance no argument or persuasive precedent to support that assertion.

would be accepted as dispositive and that only DRG revenues would be considered in calculating marginal loss. The hospitals claim further that they were unaware until 1999, when they received determinations of their appeals of 1996, 1997 and 1998 rates, that the Division considered the HRSF component of their DSH subsidies as revenue for marginal loss calculation purposes and relied on the Medicaid component of the hospitals' MCRs in determining costs. Finally, they assert that they were unaware until 2003 when the Division's Acting Director rendered his final opinion that the Division was taking the position that the entire DRG subsidy would be considered revenue, and that it was only in 2004 that the charity care component of the DRG supplement was actually considered in calculating marginal loss. In order to afford adequate notice and an opportunity for comment, each of these changes in position, the hospitals contend, should have been embodied in a regulation duly promulgated in accordance with the APA.

The hospitals argue as well that, even now, the Division has failed to ascertain the cost data that corresponds to the receipt of DSH funds.[18] They also assert that the Division's use of actual cost data in lieu of projected data based upon SHARE reports is fundamentally unfair. Moreover, the hospitals claim that the Division has given them inadequate notice of its reliance upon MCRs rather than SHARE reports.

We do not condone the delay that has occurred in connection with the processing of the hospitals' rate appeals, some of which as we have noted, have been pending for eleven years. We ex-pressed our disapproval strongly in *Hospital Center at Orange v.*

---

[18] In proceedings before the ALJ, the Division accepted for purposes of argument the hospitals' contention that variable inpatient Medicaid costs were eighty percent of total costs, a percentage that it claims far exceeds actual variable costs. With one exception (Mercer Medical Center for the year 1999), hospital reimbursement, including DSH payments, exceeded variable costs thus figured.

*Guhl,* when we condemned the Division's delay in determining rate appeals for the years 1996 through 1998.

However, we are unable to agree with the hospitals' position that the Division definitively agreed to calculate marginal loss by reference only to DRG revenue in 1995, that it accepted SHARE projections as dispositive at that time, and that its position has unfairly changed. The 1995 appeals never reached a state of resolution in which the Division's position with respect to these matters was clearly expressed.

As the Division points out, the Division has never adopted the position that DSH funding was irrelevant to a marginal loss calculation, and indeed, it has always considered such funds to be a supplement to Medicaid's individual inpatient reimbursements, albeit an unallocated one.[19] *See, e.g.,* 27 *N.J.R.* 910 (March 6, 1995) (stating in response to a comment regarding New Jersey's revised hospital reimbursement methodology that DSH payments "are in addition to the payments received through the DRG reimbursement rates); HHS Departmental Appeals Board Decision No. 1652 (March 16, 1998), 1998 HHSDAB LEXIS 29 ("While DSH payment adjustments are intended as supplemental payments to reflect the excess burden on some hospitals of the costs of providing uncompensated care, the payment adjustments are structured as part of the reimbursement for Medicaid inpatient hospital services provided by those hospitals.") We note as well that DSH revenues were considered by the Division in determining on an expedited basis an October 1996 rate appeal by United Hospitals.

---

[19] In a December 19, 2002 certification by Division Chief Financial Officer John Guhl, he states that in 1995 the Division did not object to the failure by the hospitals to include DSH payments as revenue when calculating marginal loss because "[w]e recognized that our records of Division payments under the appealed rates were the best evidence of what amounts belonged on the revenue side of the marginal cost/Medicaid payment calculation." Contrary to the hospitals' argument, we do not construe that statement as an admission that the Division considered as revenue only DRG payments during that year.

The Division's common-sense interpretation of its marginal loss regulation to permit the consideration of DSH funds as revenue in the calculation of such loss has been expressed to the hospitals and has constituted the principal issue underlying all of the pending appeals.[20] In that connection, both the Division and the hospitals have had ample opportunity to air their views as to whether the inclusion of such funds as revenue was proper or not.[21] As the result of the appellate process, the hospitals' due process rights have been fully protected. *George Harms Const. Co., supra,* 137 *N.J.* at 19–20, 644 *A.*2d 76.

Further, governing regulations have always permitted the consideration of MCR data in determining whether a marginal loss has occurred. *See N.J.A.C.* 10:52–9.1(b)2x (stating that a hospital may be required to submit, at a minimum, enumerated documentation including MCR reports in connection with any application for adjustment in rates). The Division has in the past found SHARE reports to be "responsive" to its data requirements, since they constitute another cost accounting report, *N.J.A.C.* 10:52–9.1(b)2ix. However, while the appeals were pending, cost data that initially had to be presented in projected form to meet the time requirements for appeals from projected rates became finalized in the form reported in the hospitals' MCRs. We do not find it to have been unfair for the Division to consider actual costs in lieu of projected costs in these circumstances.

Finally, there is nothing in the record to suggest that the hospitals were misled into believing that only SHARE data would be considered by the Division and solely on that basis did not file MCRs, or that any of the present appeals were denied because of

---

[20] We find no principled distinction between the inclusion of HRSF funds and charity care funds as portions of DSH revenue, since both are included in that category in the State Plan and in the implementing regulations that we have described at length and thus no fundamental unfairness in considering both.

[21] The necessity of resolving that issue undoubtedly has delayed a final resolution of the 1995 appeals as well.

the unavailability of MCR data when, in 2004, the Division considered the rate appeals at issue on the merits. If only SHARE data is available at the time that rate appeals are filed, nothing prevents their supplementation with more accurate MCR data as part of the interactive process as rate appeals progress.

## V.

██ As a final matter, we reject the hospitals' argument that the use of MCR data and the inclusion of DSH/HRSF funds as revenue in marginal loss calculations constituted *de facto* rulemaking in violation of the APA and should be considered void as the result of the absence of proper rulemaking under the standards set in *Metromedia, supra,* 97 *N.J.* at 328–37, 478 *A.2d* 742. "An agency may not use its power to interpret its own regulations as a means of amending those regulations or adopting new regulations." *Besler & Co. v. Bradley,* 361 *N.J.Super.* 168, 173, 824 *A.2d* 289 (App.Div.2003) (quoting *Venuti v. Cape May County Constr. Bd. of Appeals,* 231 *N.J.Super.* 546, 554, 555 *A.2d* 1175 (App.Div. 1989)). However, we find this maxim inapplicable to the present circumstances.

In *Metromedia,* the court held that an agency determination must be considered an administrative rule

> when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. [*Metromedia, supra,* 97 *N.J.* at 331–32, 478 *A.2d* 742.]

*Metromedia* was a successful challenge, on the ground of *de facto* rulemaking, to the utilization by the Director of the Division

of Taxation of a calculation referred to as "audience share" to measure receipts earned within New Jersey in calculating the corporate franchise tax owed to New Jersey by an out-of-state corporation broadcasting in a multi-state reception area that included this State. The Court found that the Director's *ad hoc* application of the "audience share" measure to a pending appeal constituted rulemaking that required compliance with the APA because the determination was prospective, of general applicability, continuing in its effect, was not expressly provided for by statute or clearly and obviously implied, and raised issues that could be most appropriately resolved by invoking the procedures of the APA. *Id.* at 334–35, 478 *A.*2d 742.

What distinguishes the record here from that in *Metromedia* is that, in this case, a regulation in the form of *N.J.A.C.* 10:52–9.1(b)2 existed with respect to the calculation of marginal loss at the time of the initial appeals in 1996 and remains in somewhat amended form. In *Zurbrugg,* where an issue raised was the extent and nature of fixed costs that could be considered in determining marginal loss, we characterized the applicable regulation as lacking a "definition of terms." 349 *N.J.Super.* at 37, 793 *A.*2d 17. However, in that case, we did not demand further rulemaking, but instead observed: "These regulations were in their first year of application, and no body of administrative decision-making existed to provide guidance to the hospitals regarding the limits of marginal loss including any consideration of fixed costs. Given this context, the agency cannot simply decline to consider the merits of any application without providing guidance to assure compliance with this newly enacted regulatory scheme." *Ibid.*

We construe *Zurbrugg* as evidence that the present matter, involving the same regulation that was at issue in *Zurbrugg,* is not one in which rulemaking in accordance with the APA was absent, as in *Metromedia.* It is a case in which the rulemaking resulted in a regulation that the hospitals claim is susceptible to interpretation in a manner that favors their position, whereas the Division, relying on statutory language, contends otherwise.

We find in this context that the Division's construction of its own rule did not require it to engage in additional rulemaking in accordance with the APA, but rather the interpretive process that occurred at the administrative level and is culminating here. *Cf. Cobo v. Market Transition Facility*, 293 *N.J.Super.* 374, 394, 680 *A.*2d 1103 (App.Div.1996) (distinguishing between clarification consistent with departmental intent and a material change that requires compliance with APA rulemaking). We thus reject the hospital's argument as it relates to the Division's interpretation of the marginal loss regulation.[22]

In 2005, the Division promulgated, received comment upon, and adopted an amendment to *N.J.A.C.* 10:52–9.1(b)2, that expresses the position of the Division here that DHS payments are to be considered as revenue in determining the existence of a marginal loss and was stated to constitute a clarification of current policy and practice. 37 *N.J.R.* 2506(a) (July 5, 2005). The hospitals cite the amendment as evidence of the Division's departure from existing law that precludes the Division's consideration of DHS payments as revenue prior to the amendment's passage. We decline to give the adoption of the amendment such a draconian effect, viewing it instead in accordance with the Division's explanatory statement as a clarification of the existing regulation. *In re Heller*, 73 *N.J.* 292, 308, 374 *A.*2d 1191 (1977); *County of Monmouth v. Communications Workers of Am.*, 300 *N.J.Super.* 272, 292, 692 *A.*2d 990 (App.Div.1997).

---

[22] The application of *Metromedia's* standards leads us to the same result, since the inclusion of DSH/HRSF adjustments as an element of in-patient Medicaid reimbursement was inferable from the Medicaid statute itself, there has been no demonstration that the determination to include these funds constitutes a significant change in administrative policy, and the fact-finding and informational procedures typical of rule making are not warranted in this case to assess the Division's determination to include these funds or to assure fairness to the hospitals. *See Airwork Serv. Div. of Pacific Airmotive Corp. v. Dir., Div. of Taxation*, 97 *N.J.* 290, 301, 478 *A.*2d 729 (1984), *cert. denied*, 471 *U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.*2d 278 (1985).

As a final matter, we address the hospitals' position that the Division's reliance on MCR data required a rule change. As we have already demonstrated, the use of MCR data in determining marginal loss was authorized by *N.J.A.C.* 10:52–9.1(b)2x throughout the period spanned by these appeals. We have no reason to challenge the Division's determination, presented through the certification of Division Chief Financial Officer John Guhl that, at present, the audited data contained in the hospitals' MCRs constitutes the most reliable source of cost information provided by the hospitals and is more accurate than the projections based upon unaudited data contained within SHARE reports. We rely on the Division's representation that, in accordance with applicable regulations and the practice that it adopted in 2004, it will continue to accept other cost accounting data and will rely upon that data if circumstances warrant.

The final agency determinations to utilize DSH payments as revenue in calculating marginal loss pursuant to *N.J.A.C.* 10:52–9.1(b)2 and to utilize Medicaid costs contained in hospital Medicare cost reports in such calculations are affirmed. The appeals are remanded to permit further consideration of applicable costs and such other issues as may remain. We do not retain jurisdiction.